**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re AmTrust Financial Services, Inc. Securities Litigation** | No. 1:14-cv-00736-VEC |
| | <u>CLASS ACTION</u> |
| **THIS DOCUMENT RELATES TO:** | ORAL ARGUMENT REQUESTED |
| All Actions | |

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
<u>PLAINTIFFS' SECOND CONSOLIDATED AMENDED COMPLAINT</u>

ALSTON & BIRD LLP
John D. Roesser
Todd R. David
Jessica P. Corley (*Admitted Pro Hac Vice*)
Louis A. Russo
Joseph G. Tully
90 Park Avenue
New York, New York 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel for Defendants*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 3

    A.    The Company's Results ...................................................................... 4

    B.    The GeoInvesting Report .................................................................... 4

    C.    Intercompany Transactions Are Eliminated upon Consolidation ......................... 6

    D.    SEC Comment Letters ........................................................................ 7

ARGUMENT ........................................................................................................................ 9

POINT I.

THE SECOND AMENDED COMPLAINT DOES NOT ADEQUATELY ALLEGE ANY FALSE OR
MISLEADING STATEMENT ........................................................................................... 11

    A.    Conclusory References to Public Statements, Without More, Do Not Meet
          the Stringent Particularity Requirements. .............................................. 12

    B.    Plaintiffs' Vague References to "GAAP Violations" Fail to Satisfy the
          Pleading Requirements. .................................................................... 14

        1.    Disagreements About Accounting Treatment Cannot Support a
             Fraud Claim. ...................................................................... 15

        2.    The Second Amended Complaint Fails to Plead With Particularity
             Any Facts About the Alleged Manipulation. .......................... 16

        3.    The Company Disclosed the Accounting Treatment for
             Intercompany Transactions. ................................................... 18

POINT II.

THE SECOND AMENDED COMPLAINT FAILS TO ADEQUATELY PLEAD THE REMAINING
ELEMENTS OF A SECTION 10(B) CLAIM ..................................................................... 18

    A.    Plaintiffs Have Not Pled Scienter Adequately. ........................................ 19

        1.    The Second Amended Complaint Fails to Allege the Individual
             Defendants Had Access to Reports that Contradicted Their Public
             Statements ........................................................................... 20

2.    The "Core Operations" Theory, Without More, Cannot Support an Allegation that Individual Defendants Had the Requisite Scienter ......... 21

3.    Motives Common to All Companies Cannot Support an Allegation of Scienter ............................................................................................... 22

B.    The Second Amended Complaint Does Not Allege Loss Causation Adequately. ............................................................................................... 23

CONCLUSION .............................................................................................................. 25

**TABLE OF AUTHORITIES**

**CASES**                                                                                      **PAGE(S)**

*Abely v. Aeterna Zentaris Inc.*,
    No. 12-Civ.-4711-PKC, 2013 WL 2399869 (S.D.N.Y. May 29, 2013) ................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................9

*Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel
    OAO*,
    811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd sub nom.*, *Frederick v. Mechel
    OAO*, 475 F. App'x 353 (2d Cir. 2012) ..........................................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................9

*California Pub. Employees' Ret. Sys. v. WorldCom, Inc.*,
    368 F.3d 86 (2d Cir. 2004) .................................................................................................9

*Callahan v. U.S. Filter, Inc.*,
    01-CV-6406, 2005 WL 61498 (W.D.N.Y. Jan. 11, 2005) .................................................18

*City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012) ...............................................................................................11

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
    952 F. Supp. 2d 633 (S.D.N.Y. 2013) ..........................................................................9, 10

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
    952 F. Supp. 2d 633 (S.D.N.Y. 2013) ..........................................................................9, 10

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) .............................................................................................16

*Dobina v. Weatherford International Ltd.*,
    909 F. Supp. 2d 228, 248 (S.D.N.Y. 2012) .....................................................................20

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336, 346 (2005) .............................................................................................3, 23

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ...............................................................................................4

*Garber v. Legg Mason, Inc.*,
    347 F. App'x 665 (2d Cir. 2009) ........................................................................................4

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................................21

*In re Aegon N.V. Sec. Litig.*,
    No. 03 Civ.- 0603-RWS, 2004 WL 1415973 (S.D.N.Y. June 23, 2004) ................10

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)...............................................................3, 23

*In re Cross Media Mktg. Corp. Sec. Litig.*,
    314 F. Supp. 2d 256 (S.D.N.Y. 2004)..................................................................23

*In re JP Morgan Chase Sec. Litig.*,
    No. 02-Civ.-1282-SHS, 2007 WL 950132 (S.D.N.Y. Mar. 29, 2007), *aff'd sub
    nom., ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan
    Chase Co.*, 553 F.3d 187 (2d Cir. 2009)...........................................3, 15, 16, 17

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
    No. 13-Civ-755-KBF, 2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ....................24

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    910 F. Supp. 2d 561 (S.D.N.Y. 2012)....................................................................5

*In re Marsh & Mclennan Companies, Inc. Securities Litigation*,
    501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006).....................................................16, 17

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)..................................................................22

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)..................................................................20

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).......................................................................3, 23, 24

*In re UBS AG Securities Litigation*,
    No. 07-Civ-11225-RJS, 2012 WL 4471265 (S.D.N.Y. 2002)..............................16

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)..................................................................22

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................19

*Kleinman v. Elan Corp., PLC*,
    706 F.3d 145 (2d Cir. 2013)..................................................................................19

*Lentell v.Merrill Lynch & Co. Inc.*,
    396 F.3d 161,173 (2d Cir. 2005)........................................................................23

*Levitin v. PaineWebber, Inc.*,
    159 F.3d 698 (2d Cir. 1998).................................................................................1

*Maurizio v. Goldsmith*,
    84 F. Supp. 2d 455 (S.D.N.Y.) *aff'd*, 230 F.3d 518 (2d Cir. 2000) .........................17

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..........................................................3, 9, 15, 19, 20, 21

*Plumbers & Pipefitters Local Union No. 630 Pension–Annuity Trust Fund v.
    Arbitron, Inc.*,
    741 F. Supp. 2d 474 (S.D.N.Y. 2010).................................................................21

*Pollio v. MF Global, Ltd.*,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009).......................................................12, 13, 14

*Retail, Wholesale, Dep't Store Union, AFL-CIO-CLC v. Nat'l Union of Hosp. &
    Health Care Employees, a Div. of RWDSU*,
    577 F. Supp. 29 (S.D.N.Y. 1984) .....................................................................7, 18

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2012).......................................................................... *passim*

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011)................................................................22

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148 (2008).........................................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................3, 10, 19

## Rules and Statutes

15 U.S.C. §§ 78u-4, *et seq.* (Private Securities Litigation Reform Act)............... *passim*

15 U.S.C. § 78u-4(b)(1) ...................................................................................2, 10

15 U.S.C. § 78u-4(b)(2) ...................................................................................10, 19

Fed. R. Civ. P. 9(b) ............................................................................................2, 9

S. Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679..................................9

Defendants AmTrust Financial Services, Inc. ("AmTrust" or the "Company"), Barry D. Zyskind, and Ronald E. Pipoly, Jr., respectfully submit this memorandum of law, along with the Declaration of Joseph G. Tully ("Tully Dec."), in support of their motion to dismiss the Second Consolidated Amended Complaint filed by Plaintiffs on September 8, 2014 (the "Second Amended Complaint" or "SAC"), which Plaintiffs filed in response to the Company's Motion to Dismiss filed on August 11, 2014 (the "August Motion to Dismiss"). The Second Amended Complaint superseded a Consolidated Amended Complaint Plaintiffs filed on July 7, 2014 (the "First Amended Complaint").

PRELIMINARY STATEMENT

This lawsuit should be dismissed with prejudice because it seeks cynically to abuse the securities laws and fails to satisfy the demanding pleading requirements of the Private Securities Litigation Reform Act (the "Reform Act"). Private rights of action under the securities laws are, of course, designed to remedy losses caused by an issuer's false and fraudulent statements. In this case, however, Plaintiffs seek to convert a brief drop in stock price into a claim without identifying any indicia of fraud. In their earlier complaints, Plaintiffs parroted a "short seller's" erroneous attack on AmTrust, alleging the concealment of losses through accounting fraud.[1] Plaintiffs, acknowledging the insufficiency of such allegations, filed the Second Amended Complaint. This third attempt to manufacture a lawsuit does nothing but try to create the illusion of substance by bulking up the complaint with hollow allegations of accounting fraud.

At its base, the Second Amended Complaint, like all earlier iterations, is founded upon the report issued by GeoInvesting (the "GeoInvesting Report"), a short seller with the manifest

---

[1] A short seller "speculates that a particular stock will go down in price and seeks to profit from that drop." *Levitin v. PaineWebber, Inc*., 159 F.3d 698, 700 (2d Cir. 1998).

intent to profit by driving down the price of AmTrust stock. The GeoInvesting Report criticized certain accounting treatment and practices of AmTrust by misconstruing the Company's public filings. AmTrust has consistently posted positive financial results, and AmTrust neither conceals nor eliminates losses. Seeking, however, to succeed in its bet against AmTrust stock, GeoInvesting wrote a report that coupled information in AmTrust's public filings with fictionalized speculation that things were "too good to be true." (SAC ¶ 157.) One can debate whether such attempts at stock price manipulation are lawful. But Plaintiffs' lawyers cannot convert a short seller's self-serving criticism into an alternate reality in which speculation substitutes for the detailed facts required by the Reform Act.

The Second Amended Complaint is devoid of factual investigation. Instead, it parrots the GeoInvesting view, quotes AmTrust's public filings, and liberally sprinkles in the catch phrases of fraud. But stripped of its rhetoric, the Second Amended Complaint fails for three reasons:

***No Adequate Allegations of Falsity:*** Plaintiffs here must plead with specificity the allegedly false statements and explain why such statements are false. 15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 9(b). The Second Amended Complaint fails because: (a) it quotes AmTrust filings at length and then merely concludes generally that they are false without pleading facts specifying or explaining such falsity; and (b) it attacks and describes with pejoratives AmTrust's accounting disclosures, but precedent holds that conclusory attacks on accounting treatment do not equal fraud and that, in any event, no fraud claim can stand where, as here, the relevant facts were disclosed to investors and no restatement occurred.

***Scienter Has Not Been Adequately Pled:*** Perhaps the most glaring flaw is Plaintiffs' failure to satisfy the daunting scienter pleading standard. The Reform Act elevated this standard and "[a] complaint will survive . . . only if a reasonable person would deem the inference of

-2-

scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007). The Second Circuit has explained that mere allegations of accounting violations cannot, standing alone, create the required "strong inference of fraudulent intent."[2] The Second Amended Complaint fails to present any facts to create a strong inference of scienter.

*Loss Causation Has Not Been Adequately Pled:* In *Dura Pharmaceuticals, Inc. v. Broudo*, the Supreme Court held that the loss causation requirement cannot be met solely by alleging that a company's stock price dropped. 544 U.S. 336, 346 (2005). A loss must be attributable to the relevation of concealed fact, termed a "corrective disclosure." *See, e.g.*, *In re AOL Time Warner, Inc. Sec. Litig*., 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007). Here, however, the temporary stock price drop corresponded with GeoInvesting's re-packaging (and distorting) of prior, public disclosures. As the Second Circuit has held, "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Group, Inc. Sec. Litig*., 597 F.3d 501, 512 (2d Cir. 2010).

The Second Amended Complaint lacks the factual detail required to satisfy the Reform Act and merely mimics the GeoInvesting Report in its distortion of the facts, in pursuit of financial gain for its authors.

FACTUAL BACKGROUND

AmTrust underwrites and provides property and casualty insurance in the United States and international markets, with a focus on workers' compensation insurance. (SAC ¶ 48.) The

---

[2] *See, e.g., In re JP Morgan Chase Sec. Litig*., No. 02-Civ.-1282-SHS, 2007 WL 950132, at *13 (S.D.N.Y. Mar. 29, 2007), *aff'd sub nom.*, *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (internal quotation marks omitted)); *infra* at 15-16.

Company's workers' compensation insurance policyholders in the United States are, in general, small and middle-market businesses. *See* AmTrust Financial Services, Inc., Annual Report (Form 10-K) (Mar. 3, 2014) (Tully Dec., Ex. 1). [3]

Barry D. Zyskind has worked at the Company for approximately 16 years and has served as its Chief Executive Officer for the past nine years. (SAC ¶ 49.) Ronald E. Pipoly, Jr. is the Company's Chief Financial Officer. (*Id.* ¶ 44.)

## A.    The Company's Results

On November 5, 2013, the Company released its results for the third-quarter and year-to-date 2013. *See* AmTrust Financial Services, Inc., Current Report (Form 8-K) (Nov. 5, 2013) (Tully Dec., Ex. 2). The Company announced year-to-date net earned premium of $1.56 billion, up 55.5 percent over year-to-date 2012. *See id.* The Company also announced a diluted earnings-per-share of $2.84, compared to $1.61 per share for year-to-date 2012. *See id.* In response, shares in the Company gained approximately ten percent for the day. [4]

Indeed, it is undisputed that the Company has provided consistent positive results for its shareholders (SAC ¶¶ 150–51), and that its financial results have been audited by an independent accounting firm. *See, e.g.,* AmTrust Financial Services, Inc., Annual Report (Form 10-K) (Mar. 3, 2014) (Tully Dec., Ex. 1), p. F-5.

## B.    The GeoInvesting Report

In light of the Company's positive results, this case lacks any of the earmarks of securities fraud; there has been no financial impropriety or related adverse government action or

---

[3] A Court may take judicial notice of SEC filings. *See, e.g.*, *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009).

[4] "[T]he district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n. 8 (2d Cir. 2000).

scandal.  Instead, this case was manufactured by the market manipulation of a short seller.

On December 12, 2013, a month after the Company announced its third quarter results, an article appeared on the website www.seekingalpha.com, entitled, "AmTrust Financial Services:  A House of Cards?"  (SAC ¶ 92, Ex. J.)  The article identified "The GeoTeam," also known as "GeoInvesting," as its author.  (*Id.*)  The article also stated:  "Disclosure:  I am short AFSI."[5]  No actual "facts" were revealed in the report; it simply repackaged, in a negative and misleading manner, previously publicly available information about the Company.

Short sellers "have an obvious motive to exaggerate the infirmities of the securities in which they speculate."  *In re Longtop Fin. Techs. Ltd. Sec. Litig*., 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012).  And that is what GeoInvesting did here.  For example, the GeoInvesting Report declared, in conclusory fashion, that "[a] cross section of public documents . . . shows that AFSI appears to be excluding losses of wholly-owned subsidiaries in its SEC filings."  (SAC ¶ 93.)  Since the posting of the GeoInvesting Report, the Company and its representatives have addressed its claims:  on December 16, 2013, the Company held an investor conference, in which Messrs. Zyskind and Pipoly explained that the Company did not conceal losses; and on a February 13, 2014 earnings call, Messrs. Zyskind and Pipoly addressed the article.  (*Id.* ¶¶ 100, 104.)

And from the date of the Report's publication—when, according to the Second Amended Complaint, an approximately $300 million hole in the books of AmTrust was exposed—the share price of AmTrust has *increased approximately 50 percent*, from $33.67 to $50.20 per share.  On May 30, 2014, A.M. Best confirmed that it had granted AmTrust a "financial strength rating" of "A (Excellent)."  *See* Press Release, A.M. Best Company, A.M. Best Comments on the

---

[5] The copy of the GeoInvesting Report attached to the Second Amended Complaint as Exhibit J omits this disclosure.  A copy of the article with the disclosure visible is annexed as Exhibit 14 to the Declaration of Joseph G. Tully.

Ratings of AmTrust Financial Services, Inc. Following Announced Transaction With Tower Group (Jan. 10, 2014) (Tully Dec., Ex. 3). The rating reflected, among other things, "AmTrust's solid balance sheet strength." (*Id.*) Moreover, Plaintiffs repeatedly allege that AmTrust operates in a highly regulated industry (SAC ¶¶ 72, 78, 84, 90, 108–14), yet was able to conceal $300 million in losses. But since the release of the GeoInvesting Report, no regulator has investigated, let alone discovered, any alleged accounting fraud.

## C.     Intercompany Transactions Are Eliminated upon Consolidation

Both GeoInvesting and Plaintiffs' discussion of intercompany transactions are deliberately misleading and ignore Company disclosures. The Company's financial statements expressly disclose that significant transactions between the Company and its subsidiaries are eliminated during consolidation.

The Company's public disclosures explain how it manages risk, through the use of reinsurance agreements between entities within its corporate structure. "AmTrust operates eleven domestic U.S. insurance subsidiaries that write policies, take in insurance premiums and pay out losses incurred on those policies." (SAC ¶ 56.) "AmTrust owns a Bermuda reinsurance subsidiary, AmTrust International Insurance, Ltd. ["AmTrust Bermuda"] . . . which reinsures the bulk of [AmTrust's] US insurance subsidiaries' written premiums." (*Id.* ¶ 57.) "Reinsurance is a transaction between insurance companies in which the original insurer, or ceding company, remits a portion of its policy premiums to a reinsurer, or assuming company, as payment for the reinsurer assuming a portion of the insured policies' risk." *See* AmTrust Financial Services, Inc., Annual Report (Form 10-K) (Mar. 3, 2014) (Tully Dec., Ex. 1).

Plaintiffs do not dispute that, through intercompany transactions, AmTrust Bermuda cedes losses to the Company's subsidiaries in Luxembourg. (SAC ¶ 64.) These intercompany

transactions occur pursuant to intercompany agreements, including "stop-loss agreement[s]," whereby AmTrust Bermuda cedes "up to $100 million" annually to AmTrust's subsidiaries in Luxembourg. (*Id.*) For each year of the purported Class Period, regulatory filings disclosed the amount that AmTrust Bermuda ceded to the Company's subsidiaries in Luxembourg, and the GeoInvesting Report cited to these public disclosures. (*Id.* ¶¶ 25, 93, 99, 113, 114, 130) There is no factual basis in the Second Amended Complaint to allege the falsity of these disclosures.

The Company's financial statements filed during the purported Class Period expressly disclose that "[a]ll significant transactions and account balances between the Company and its subsidiaries were eliminated during consolidation."[6] And this is consistent with standard accounting practice; it is "a matter of standard accounting practice" that "transactions between the consolidated entities would no longer be shown on their consolidated financial statement." *See Retail, Wholesale, Dep't Store Union, AFL-CIO-CLC v. Nat'l Union of Hosp. & Health Care Employees, a Div. of RWDSU*, 577 F. Supp. 29, 31 (S.D.N.Y. 1984).[7]

**D.     SEC Comment Letters**

In the Second Amended Complaint, for the first time, Plaintiffs refer to correspondence between the SEC and the Company (SAC ¶¶ 186–89), trying to turn an academic discussion of how certain items are reported, into evidence of fraud. In fact, the SEC concluded its review of the Company's 2012 financial statements without requiring a restatement. *See* Letter from a

---

[6] *See* AmTrust Financial Services, Inc., Annual Report (Form 10-K) (Mar. 1, 2013) (Tully Dec., Ex. 4), p. F-16; AmTrust Financial Services, Inc., Annual Report (Form 10-K) (Mar. 15, 2012) (Tully Dec., Ex. 5), p. F-15; AmTrust Financial Services, Inc., Annual Report (Form 10-K) (Mar. 15, 2011) (Tully Dec., Ex. 6), p. F-15.

[7] It is important to note that the elimination of transactions between consolidated entities does not mean the elimination of losses. AmTrust incurs losses because it issues insurance policies and a certain number of policyholders make claims on these policies. AmTrust reinsures the policies. Had AmTrust used a third party reinsurer, the losses would have been borne by the third party, not AmTrust. But here, because AmTrust reinsures through a subsidiary, the losses go nowhere. What is eliminated upon consolidation is the effect of reinsurance, not the losses themselves. And Plaintiffs have not pled otherwise; there are no allegations that the losses themselves were eliminated.

SEC Sr. Asst. Chief Accountant to R. Pipoly, Jr. (June 23, 2014) (Tully Dec., Ex. 7).

The review commenced with a November 5, 2013 letter, in which the SEC asked the Company to explain why it was appropriate to classify certain ceding commissions as revenue. *See* Letter from a SEC Sr. Asst. Chief Accountant to R. Pipoly, Jr. (Tully Dec., Ex. 8).

The Second Amended Complaint alleges that "the SEC insisted that AmTrust acknowledge in writing that this accounting treatment as an error [*sic*] in violation of US GAAP." (SAC ¶ 188.) Actually, the SEC asked the Company to provide an analysis that would support the Company's conclusion that the reclassifications did not constitute corrections of errors. *See* Letter from a SEC Sr. Asst. Chief Accountant to R. Pipoly, Jr. (March 26, 2014) (Tully Dec., Ex. 9.) In response, the Company provided a detailed analysis. *See* Letter from R. Pipoly, Jr. to a SEC Sr. Asst. Chief Accountant (Apr. 8, 2014) (Tully Dec., Ex. 10); Letter from R. Pipoly, Jr. to SEC Sr. Asst. Chief Account (May 20, 2014) (Tully Dec., Ex. 11); Letter from a R. Pipoly, Jr. to SEC Sr. Asst. Chief Accountant (June 20, 2014) (Tully Dec., Ex. 12). The last letter was dated June 20, 2014, and the SEC completed its review three days later. Although the Company proposed to modify its accounting treatment going forward, it also detailed why its past accounting treatment was reasonable and justified. *See* Letter from R. Pipoly, Jr. to SEC Sr. Asst. Chief Accountant (Dec. 4, 2013) (Tully Dec., Ex. 13)). Importantly, the Company was never required to acknowledge any errors or restate any financial statement.

Moreover, although ignored by Plaintiffs, in the same correspondence, the SEC asked the Company to explain the "effects in your GAAP consolidated financial statements of transacting with [Luxembourg] captives directly and, if applicable, indirectly through third parties." *See* Letter from a SEC Sr. Asst. Chief Accountant to R. Pipoly, Jr. (Nov. 5, 2013) (Tully Dec., Ex. 8). The Company responded and, again, the SEC did not require a restatement. Thus, the

SEC—the government entity tasked with reviewing disclosures—looked into the very issue about which Plaintiffs complain and took no action.

**ARGUMENT**

In addition to the general pleading requirements,[8] Plaintiffs must comply with the exacting strictures of the Reform Act, which were "intended to curtail 'strike suits'—*i.e.*, meritless class actions alleging fraud in the sale of securities." *California Pub. Employees' Ret. Sys. v. WorldCom, Inc*., 368 F.3d 86, 98 (2d Cir. 2004). Indeed, Congress passed the Reform Act in response to "significant evidence of abuse in private securities lawsuits," including "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability. . . ." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting H.R. Conf. Rep. No. 104-369, at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731)). In response, the Reform Act created a "uniform and stringent pleading requirement" to augment the requirements of Federal Rule of Civil Procedure 9(b). S. Rep. No. 104-98, at 15 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 694.

The Reform Act's heightened pleading requirements make securities litigation, and its motion practice, significantly different from other types of litigation. In effect, the Act accords to "district courts a 'gatekeeper' responsibility to derail dubious class action lawsuits at the outset . . . ." *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp*., 952 F. Supp. 2d 633, 635 (S.D.N.Y. 2013). Under the heightened pleading requirements of the Reform Act, "the perhaps-too-easily satisfied 'notice pleading' requirements . . . have been replaced . . . by a 'demurrer-like' process that creates considerable hurdles that a plaintiff must overcome before

---

[8] To survive a motion to dismiss, the factual allegations in a complaint must allege sufficient facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations omitted). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

any discovery is permitted." *Id.* at 635. As relevant here, the Reform Act has two heightened pleading requirements. *First*, Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). *Second*, in alleging that each defendant acted with a particular state of mind, "the complaint shall, with respect to each act or omission alleged to violate [the laws of the securities exchanges], state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added).

The Reform Act's "'strong inference' standard 'unequivocally raise[d] the bar for pleading scienter.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 317 (2007). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 309. The inquiry into whether a strong inference of scienter has been pled is "inherently comparative" and requires a court to "consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 310.

"Where a plaintiff fails to satisfy these stringent standards, the Reform Act mandates dismissal." *In re Aegon N.V. Sec. Litig.*, 03 CIV. 0603(RWS), 2004 WL 1415973 at * 6 (S.D.N.Y. June 23, 2004) (citing 15 U.S.C. § 78u-4(b)(3)(A)). Here, the Second Amended Complaint must be dismissed because it fails to plead an actionable misstatement or omission or a strong inference of scienter in accordance with the Reform Act's heightened pleading requirements, and fails to plead loss causation.

### THE SECOND AMENDED COMPLAINT DOES NOT ADEQUATELY
### ALLEGE ANY FALSE OR MISLEADING STATEMENT

Claims under Sections 10(b) and 11 "share a material misstatement or omission element." *City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67–68 (2d Cir. 2012). And where, as here, Section 11 claims "are premised on allegations of fraud," it is well-settled that the heightened pleading requirements of the Reform Act apply to Section 11 claims as well as Section 10(b) claims.[9] *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2012). Plaintiffs have not met this standard.

Plaintiffs contend that AmTrust concealed losses and loss adjustment expense. In earlier complaints, Plaintiffs parroted the allegations contained in the GeoInvesting Report, contending that the Company relied on Luxembourg equalization balances to accomplish the alleged concealment. Plaintiffs' new theory comes to a different conclusion: "rather than relying on the Luxembourg equalization balances to fraudulently erase the $289.9 million in losses, in the process of consolidating its financial statements, AmTrust 'eliminated' the balance of the $289.9 million in loss and loss adjustment expense by misclassifying them as other non-underwriting expense items on its consolidated income statement."[10] (SAC ¶ 27.) This allegation is based on sheer speculation; it is not supported by any particularized allegations of fact that any loss was classified as anything other than a loss or that anything that was a loss was misclassified as an expense. Indeed, Plaintiffs admit that it is based on pure speculation: "AmTrust has never specified how it accounts for these losses or whether these losses are reclassified as other types of expense through the use of eliminating entries in the consolidating process." (*Id.* at ¶ 66.)

---

[9] Plaintiffs' Section 11 claim sounds in fraud because the allegations underlying the 1933 and 1934 Act claims are almost identical. *Compare, e.g.*, SAC ¶¶ 168, 171 (Securities Act claim), *with id.* ¶¶ 148–50 (Exchange Act claim).

[10] Again, it is important to note that no losses are eliminated through consolidation, only the effects of reinsurance by a related company are eliminated.

But even after disowning GeoInvesting's theory of fraud—and the theory expressed in Plaintiffs' earlier complaints—the Second Amended Complaint still devotes several paragraphs to equalization reserves and GAAP provisions applicable to those reserves. (*Id.* ¶¶ 26, 59–66, 130–31.) Plaintiffs also plead all sorts of atmospherics in an attempt to bolster their weak allegations, including that the Company's results are "too good to be true" (*id.* ¶¶ 151–57), that other companies with results too good to be true failed (*id.* ¶¶ 158–161),[11] and that the SEC reviewed the accounting (*id.* ¶¶ 186–89), but none of this can repair Plaintiffs' failure to plead a misstatement or omission with particularity.

The Section 10(b) and 11 claims Plaintiffs allege should be dismissed in their entirety.

**A.    Conclusory References to Public Statements, Without More, Do Not Meet the Stringent Particularity Requirements.**

Merely reciting public statements without specifying any portion as false does not satisfy the heightened pleading requirements for Plaintiffs' Sections 10(b) and 11 claims. *See, e.g.*, *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 570 (S.D.N.Y. 2009). But that is all Plaintiffs have done here. With respect to the individual defendants, the Second Amended Complaint attributes no quotations or specific statements to Messrs. Zyskind and Pipoly. Instead, it merely recycles the same conclusory paragraph:

> In an investor conference call that same day, Zyskind and Pipoly touted AmTrust's fiscal . . . financial performance. In particular, Pipoly and Zyskind discussed the amount of loss and loss adjustment expense that AmTrust incurred in . . . as well as its loss ratio and combined ratio. Zyskind and Pipoly also made in depth statements about the reasons for AmTrust's losses, and loss ratios and the trends it was experiencing for these key metrics.

(*See* SAC ¶¶ 69, 75, 81.) It then cites to the full transcript of each earnings call referenced, but nowhere do Plaintiffs explain what was misleading or how. (*Id.*)

---

[11] These allegations are a perfect example of the overreaching by Plaintiffs in their attempt to manufacture a lawsuit. It is easy for the Plaintiffs to point to other companies that failed, but what about the companies that succeeded? And since when did being successful form the basis of a securities class action?

The Second Amended Complaint employs the same boilerplate allegations with respect to alleged misrepresentations by the Company found in the First Amended Complaint, reciting the same paragraph on multiple occasions, substituting only the relevant year and amount of reported losses:

> In the . . . press release and the . . . 10-K, AmTrust understated loss and loss adjustment expense . . . because it failed to properly record . . . loss and loss adjustment expenses that were reported by its subsidiaries to State and Bermuda insurance regulators, but were not included and recorded as loss and loss adjustment expense in AmTrust's . . . year-end consolidated financial statements. As result, AmTrust overstated its underwriting income by $70.97 million and also understated its loss ratio and combined ratio.

(SAC ¶¶ 72, 78, 84). Such allegations are insufficient as a matter of law. *Rombach*, 355 F.3d at 172 ("Although the complaint catalogs a number of statements made by the individual defendants, nothing in the complaint explains with adequate specificity how those statements were actually false or misleading"); *MF Global, Ltd.*, 608 F. Supp. 2d at 570 (dismissing complaint that quoted from press releases and other statements the defendants allegedly made during the class period without identifying the allegedly false or misleading portions).

Here, Plaintiffs fail to provide even the level of specificity the courts found unsatisfactory in *MF Global* and *Rombach*. The Second Amended Complaint references press releases, annual statements, and investor calls, but does not include a single quotation from them, indicate which portion was misleading, or explain how it was misleading. (SAC ¶¶ 68-72, 74-78, 80-84.) For example, the Second Amended Complaint alleges that, during investor calls, Messrs. Zyskind and Pipoly "made in depth statements about the reasons for AmTrust's losses, loss ratios and net income,"[12] but Plaintiffs never explain which portions of those "in depth statements," if any,

---

[12] Indeed, Plaintiffs' attempt to turn this discussion into evidence of misstatements is ludicrous. Insurance companies write policies and certain policyholders make claims, leading to losses. Of course executives discuss these losses, loss ratios, and net income during investor calls; the loss ratio (the ratio between incurred losses and earned premium) is a key metric of the underwriting performance of an insurance company.

were false.  (*Id.* ¶¶ 69, 81.)  As the court held in *Rombach,* "plaintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity *why and how that is so*."  355 F.3d at 174 (emphasis added).

**B.      Plaintiffs' Vague References to "GAAP Violations" Fail to Satisfy the Pleading Requirements.**

In the earlier complaints, Plaintiffs adopted the analysis of GeoInvesting Report, in its entirety.  Now, alleging that "GeoInvesting may have been mistaken as to the accounting mechanism by which" AmTrust allegedly concealed losses (SAC ¶ 135), plaintiffs float a new theory, alleging vaguely that the Company concealed losses through a "different more, clever [*sic*] machination."  (*Id.*).

This new theory, however, is not based on facts nor a GAAP provision or FASB standard that AmTrust allegedly violated, ignores that the accounting was the subject of an independent audit, points to no findings by anyone that the accounting treatment was improper, and does not otherwise contain any of the detail or factual investigation required by the Reform Act.  (*Id.* ¶¶ 135, 143.)  Rather, this new theory is based entirely on one paragraph contained in a *pleading in this action*, the August Motion to Dismiss.  (*Id.* ¶¶ 134, 138.)  Plaintiffs contend—based solely on this pleading—that the Company did not properly account for losses:  "AmTrust has represented that it has used elimination entries in the consolidation process to eliminate the $289.9 million in loss and loss adjustment expense (rather than simply fraudulently remove them from the financial statements)."  (*Id.* ¶ 143.)  Without more, and upon only information and belief, the Second Amended Complaint concludes:

> If this is true, AmTrust used these elimination entries to improperly reclassify or misclassify loss and loss adjustment expenses for the Luxemburg subsidiaries (and other subsidiaries) to appear on other, unrelated, lines in the AmTrust consolidated income statements for 2010 through 2012.

(*Id.* ¶ 143.)  Plaintiffs then conclude that "[t]his is a material violation of GAAP and has caused

AmTrust's financial statements to be materially false and misleading."  (*Id.*)[13]

As demonstrated below, such baseless allegations of accounting fraud must fail for at least three reasons:  (1) disagreements about accounting treatment are as a matter of law insufficient to support a fraud claim; (2) the Second Amended Complaint fails to plead with particularity any facts about the allegedly accounting fraud; and (3) the Company adequately disclosed the accounting treatment for intercompany transactions.

### 1.      Disagreements About Accounting Treatment Cannot Support a Fraud Claim.

Although the Second Amended Complaint makes passing references to a "clever accounting machination" in violation of GAAP, Plaintiffs have not alleged that the Company restated the losses or net income it reported during the purported Class Period.  Indeed, the SEC reviewed the accounting, did not allege any material violations of GAAP, and did not require any restatement.  Where no restatement occurs, a disagreement about accounting treatment and the interpretation of GAAP provisions cannot form the basis of a securities claim.

In *In re JP Morgan Chase Securities Litigation*, the complaint alleged, *inter alia*, that the defendants failed to disclose certain related party transactions, in violation of GAAP.  *See* 2007 WL 950132, at *13.  The court held that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim . . . ."  *See id.* (quoting *Novak*, 216 F.3d at 309 (internal quotation marks omitted)).  The court found it significant that the complaint lacked allegations that the SEC had reached any adverse findings with respect to the company's filings or forced the defendant to restate its financial statements.  *See id.*  Absent such allegations, the court suggested that "reasonable accountants could differ"

---

[13] Of course, the SEC reviewed the accounting and did not require any restatement.  (*See, supra,* at 7-9.)  There was no hiding of losses, just the elimination of the effect of reinsurance between subsidiary companies. Intercompany relationships do not change the numbers and the losses reported on the balance sheet are unaffected by the intercompany reinsurance, the losses are the same with or without it.

as to the proper accounting treatment of the related party transactions.  *See id.*

Similarly, in *In re UBS AG Securities Litigation*, the court concluded that the failure to allege that the corporate defendant restated its financials "significantly undercut[]" the plaintiffs' allegations.  07-Civ.-11225-RJS, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).  The same failure exists here.

### 2.     The Second Amended Complaint Fails to Plead With Particularity Any Facts About the Alleged Manipulation.

Although the Second Amended Complaint alleges the Company committed "a material violation of GAAP" that "has caused AmTrust's financial statements to be materially false and misleading," it neither identifies the GAAP provision allegedly violated nor pleads with particularity how the Company violated that provision through its alleged accounting treatment of loss and loss adjustment expense.[14]  (SAC ¶ 143.)  Such conclusory allegations are insufficient to satisfy the Reform Act.

In *In re Marsh & Mclennan Companies, Inc. Securities Litigation*, plaintiffs alleged that defendants had engaged in misrepresentations through improper accounting.  *See* 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006).  The court wrote that the "gravamen of these allegations" was that defendant "engaged in accounting fraud, violating GAAP, by failing to present a true representation of the Company's operations."  *Id.*  "Notably missing," the court observed, were "specific examples of fraudulent accounting practices utilized by" defendant, "citations to GAAP provisions prohibiting" defendant's "accounting practices, or reference to any cases finding violations of GAAP on the basis of actions similar to those alleged by Plaintiffs."  *Id.*  The court

---

[14] The Second Amended Complaint interprets a few unidentified GAAP provisions and quotes from a few others, but it never ties those GAAP provisions to any specific allegation.  In addition, many of the GAAP provisions cited, some applicable only in Luxembourg, relate to equalization reserves, which have relevancy only in the context of GeoInvesting's theory of accounting fraud, a theory Plaintiffs seem to have abandoned.  (*Id.*  ¶¶ 62, 63, 66, 130.)

also noted that "there was no restatement of earnings or external investigation of" defendants "accounting practices." *Id.* Finally, in dismissing the complaint, the Court wrote that plaintiffs' "arguments stretche[d] the definition of accounting fraud to its breaking point, as none of the hallmarks of accounting fraud" were present. *See id.*

Here, specific examples of the alleged accounting fraud are similarly absent from the Second Amended Complaint. Instead, Plaintiffs latch onto legal arguments within the August Motion to Dismiss and extrapolate a vague hypothesis as to how the Company may have concealed losses. (SAC ¶ 143). Without more, Plaintiffs leap to the conclusion that the Company "used these elimination entries to improperly reclassify or misclassify loss and loss adjustment expenses . . . ." (*Id.*)

The Second Amended Complaint pleads no facts supporting this conclusion and cites no GAAP provision that would prohibit either the accounting practices that the Company disclosed or the accounting practices that Plaintiffs suspect the Company engaged in, a fact the court found fatal in *Marsh & McLennan*. *See* 501 F. Supp. 2d at 477. And, as noted previously, the Second Amended Complaint lacks any allegation that the Company restated its financial statements or faced any regulatory investigation in light of the alleged material GAAP violations, other factors which the court in *Marsh & McLennan* found dispositive. *See id.*

Plaintiffs' reliance on the August Motion to Dismiss demonstrates the complete absence of well-pled facts. (*See, e.g.*, SAC ¶¶ 134, 138.) Courts, however, "will not transform such legal arguments into judicial admissions." *Maurizio v. Goldsmith*, 84 F. Supp. 2d 455, 464 (S.D.N.Y.) *aff'd*, 230 F.3d 518 (2d Cir. 2000). These statements from the August Motion to Dismiss were stated "strictly for purposes of supporting a particular argument," and cannot be transformed into

admissions of fact to supplement the Second Amended Complaint's shortcomings. *See Callahan v. U.S. Filter, Inc.*, 01-CV-6406, 2005 WL 61498, at *2 (W.D.N.Y. Jan. 11, 2005).

### 3. The Company Disclosed the Accounting Treatment for Intercompany Transactions.

The accounting treatment at issue was fully disclosed in public filings, thus negating any possible allegations of falsity or fraud.[15]

Throughout the Class Period, the annual statements of the Company disclosed that transactions between its subsidiaries were eliminated when the company consolidated or combined the financial results of those subsidiaries into the parent company. Specifically, the SEC 10-Ks filed by the Company disclosed as follows:

> The consolidated financial statements of the Company have been prepared in conformity with accounting principles generally accepted in the United States of America. The consolidated financial statements include the accounts of the Company and its domestic and foreign subsidiaries . . . . *All significant transactions and account balances between the Company and its subsidiaries were eliminated during consolidation.*

*See id.* It is "a matter of standard accounting practice" that "transactions between consolidated entities would no longer be shown on their consolidated financial statement." *Retail, Wholesale, Dep't Store Union, AFL-CIO-CLC v. Nat'l Union of Hosp. & Health Care Employees, a Div. of RWDSU*, 577 F. Supp. 29, 31 (S.D.N.Y. 1984).[16]

### POINT II.
### THE SECOND AMENDED COMPLAINT FAILS TO ADEQUATELY PLEAD THE REMAINING ELEMENTS OF A SECTION 10(B) CLAIM

In addition to alleging falsity with the requisite particularity, to state a claim under

---

[15] *See* AmTrust Financial Services, Inc., Annual Report (Form 10-K) (Mar. 1, 2013) (Tully Dec., Ex. 4), p. F-16; AmTrust Financial Services, Inc., Annual Report (Form 10-K) (Mar. 15, 2012) (Tully Dec., Ex. 5), p. F-15; AmTrust Financial Services, Inc., Annual Report (Form 10-K) (Mar. 15, 2011) (Tully Dec., Ex. 6), p. F-15 (emphasis added).

[16] Again, losses are not eliminated in consolidation. What is eliminated is the impact of intercompany reinsurance. These intercompany transactions, and their consolidation, have no impact whatsoever on losses; they still exist and are not eliminated.

Section 10(b), Plaintiffs must also satisfy the Reform Act's pleading standards as to (1) scienter, and (2) loss causation. *See, e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). The Second Amended Complaint adequately alleges neither.

## A.     Plaintiffs Have Not Pled Scienter Adequately.

The Reform Act requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In other words, scienter allegations "must give 'rise to a strong inference' of fraudulent intent." *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013) (citing 15 U.S.C. § 78u-4(b)(2)(A)). In *Tellabs*, the Supreme Court wrote: "To qualify as 'strong,' . . . an inference must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 314. In performing this comparative analysis, the court "must consider not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id*. at 314. Finally, it is well-established law in this Circuit that "a plaintiff cannot base securities fraud claims on speculation and conclusory allegations." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). This tenet should apply with particular force here, where the conclusory allegations originated in the self-serving report of a short seller.

In the Second Circuit, conclusory "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak*, 216 F.3d at 309. Instead, "[o]nly where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient." *See id.* (quoting *Chill v. Gen. Elec. Co*., 101 F.3d 263, 270 (2d Cir. 1996)) (internal citations omitted). There are no such allegations in the Second Amended Complaint; taken as a whole, the Second Amended Complaint's scienter allegations are inadequate.

### 1. The Second Amended Complaint Fails to Allege the Individual Defendants Had Access to Reports that Contradicted Their Public Statements

The Second Amended Complaint alleges that Messrs. Zyskind and Pipoly, "[b]y virtue of their positions at AmTrust . . . . knew or recklessly disregarded that material facts were being misrepresented as described above." (SAC ¶ 216.)[17] According to Plaintiffs, "Zyskind and Pipoly would have reviewed and approved the statutory financial statements of each of AmTrust's subsidiaries prior to their being filed with regulators each year," and, based on that review, "each had knowledge that AmTrust was not reporting all of the loss and loss adjustment expense that it was incurring each fiscal year." (*Id.* ¶ 128.) Although the Second Amended Complaint identifies documents that would have informed the individual defendants about the financial position of each of the Company's separate subsidiaries, it fails to identify any reports that would have informed them that the Company improperly consolidated the financial statements of those entities into the Company's audited financial statements.

In *Dobina v. Weatherford International Ltd*., the plaintiffs alleged GAAP violations, resulting in overstated net income, net earnings, and purported growth. *See* 909 F. Supp. 2d 228, 248 (S.D.N.Y. 2012). The plaintiffs alleged recklessness on the part of the individual defendants, including the CEO and CFO, merely because they had access to certain financial information, including "a monthly spreadsheet detailing intercompany receivables and payables . . . ." *See id.* at 249. The court was unpersuaded by this "access to information theory," because the allegations did not go "beyond a 'broad reference to raw data' that the [Second] Circuit has concluded is insufficient to allege access to information as a basis for *scienter*." *See id.* (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*

---

[17] It should be noted that the Second Amended Complaint contains no allegations that the individual defendants sold any stock during the relevant period, which undercuts an inference of scienter as a matter of law. *See, e.g.*, *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000).

*Inc.*, 531 F.3d 190, 196 (2d Cir. 2008)).  Moreover, the court noted that there were no allegations that the individual defendants were provided with the spreadsheet of intercompany transactions. *See id.*

Here, the Second Amended Complaint alleges only that the individual defendants had access to raw data, in the form of the separate and unconsolidated financials of the Company's subsidiaries.  (SAC ¶ 128.)  There are no allegations that the individual defendants received reports that showed the Company, when consolidating that data, applied an allegedly improper accounting treatment to loss and loss adjustment expense.  For this reason, the Second Amended Complaint fails to plead scienter sufficiently.  *See, e.g., Novak*, 216 F.3d at 309 ("[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

### 2. The "Core Operations" Theory, Without More, Cannot Support an Allegation that Individual Defendants Had the Requisite Scienter

Almost in passing, the Second Amended Complaint states that "[t]he amount of AmTrust's loss and loss adjustment expense, its loss ratios, as well as its loss and loss adjustment reserves are key financial performance metrics that are fundamental to the core operations of the Company." (SAC ¶ 127.)  This reference to "core operations" refers to a theory that was articulated prior to the enactment of the Reform Act.  "It is questionable whether the 'core operations' doctrine has survived the [Reform Act] at all," because the Second Circuit has not decided the issue, and those Courts of Appeal that have continued to accept it have done so only to bolster other substantial grounds for scienter.[18]  In other words, the "core operations" theory is

---

[18] *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 596 n. 17 (S.D.N.Y. 2011); *see also Plumbers & Pipefitters Local Union No. 630 Pension–Annuity Trust Fund v. Arbitron, Inc.*, 741 F. Supp. 2d 474, 490 (S.D.N.Y. 2010) ("Whether a plaintiff may rely on the core operations doctrine in light of the [Reform Act] has not been decided by the Court of Appeals for the Second Circuit.  Those Courts of Appeals that have addressed the question have found that it is no longer viable in most situations." (internal citation omitted).

not an independent basis for pleading scienter, only a supplementary one. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011).

Assuming this Court—consistent with other district courts in this district and the Circuit Courts of Appeal—considers the "core operations" theory as a supplement to other, substantial allegations of scienter, the Second Amended Complaint lacks any substantial grounds that would raise an inference of scienter on the part of the individual defendants. It fails to plead that the individual defendants had access to reports or statements that contradicted the public statements of either the Company or the individual defendants during the Class Period.

### 3. Motives Common to All Companies Cannot Support an Allegation of Scienter

Plaintiffs allege that "AmTrust had a motive to conceal its losses and inflate its underwriting income because it completed a number of stock, note, and bond offerings during the Class Period." (SAC ¶ 176.) Plaintiffs allege further that, "during the Class Period, AmTrust obtained over $600 million of equity and debt financing by understating its losses and overstating its income." (*Id.* ¶ 185.)

"The Second Circuit has rejected allegations such as a desire for the corporation to appear profitable as 'insufficient' to plead motive." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 262 (S.D.N.Y. 2003). Thus, a "bald allegation that defendants committed fraud out of a desire to raise capital for the corporation does not give rise to a strong inference of fraudulent intent." *Russo v. Bruce*, 777 F. Supp. 2d 505, 520 (S.D.N.Y. 2011).

Plaintiffs allege also that AmTrust's lenders "required it to maintain financial metrics that would have been violated had the losses not been concealed." (SAC ¶ 177.) But a company's need "to comply with various financial covenants in its loan agreements is similarly deficient as a motive allegation as they are common to most companies." *Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 867 (S.D.N.Y.

2011), *aff'd sub nom.*, *Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). Therefore, AmTrust's "alleged desire[] to raise additional capital" or its desire "to maintain compliance with the financial covenants of a company loan agreement are . . . inadequate to support an allegation of intent to commit fraud." *In re Cross Media Mktg. Corp. Sec. Litig*., 314 F. Supp. 2d 256, 265 (S.D.N.Y. 2004).

## B.     The Second Amended Complaint Does Not Allege Loss Causation Adequately.

A key requirement to plead loss causation is the existence of a corrective disclosure that triggered the alleged loss in share value. *See, e.g.*, *In re AOL Time Warner*, 503 F. Supp. 2d at 677. Merely alleging the legal conclusion that loss causation exists does not pass muster. *See Dura*, 544 U.S. at 343. A complaint must do more than merely allege that a company's shares declined substantially in value after purchase. *See Dura*, 544 U.S. at 343. Instead, the complaint must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v.Merrill Lynch & Co. Inc.*, 396 F.3d 161,173 (2d Cir. 2005). A complaint can make this showing "by alleging that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted." *In re AOL Time Warner, Inc. Sec. Litig.,* 503 F. Supp. 2d at 677.

The Second Circuit has held that "[a] negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597 F.3d at 512. In *Omnicom*, the plaintiffs had alleged that information contained in a Wall Street Journal article constituted a partial corrective disclosure, which caused the market price of the company to drop. *Omnicom*, 597 F.3d at 512–13. The article raised concerns about the corporate defendant's "aggressive accounting strategy" with respect to the elimination of losses through intercompany transactions. *See id.* at 511. The court found that the

article merely cast previously known facts in a negative light, because the "accounting method to remove losses from [the corporate defendant's] books" had been previously disclosed. *Id.* at 512

Similarly, the GeoInvesting Report was nothing more than a negative characterization of the loss and earnings information previously disclosed to the market in various financial statements. (SAC ¶¶ 25, 93–94). And, as in Omnicom, the accounting method used to eliminate intercompany transactions had been disclosed to the market prior to the release of the GeoInvesting Report. Therefore, it disclosed no new facts to the market and cannot serve as a corrective disclosure of the alleged "accounting machination." *See id.* at 512–13; *see also In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, No. 13-Civ.-755-KBF, 2014 WL 585658, at *14 (S.D.N.Y. Feb. 14, 2014) (dismissing action where alleged corrective disclosure, a posting to a financial news website, merely critiqued previously disclosed information). There is, therefore, no corrective disclosure here and Plaintiffs have failed to allege loss causation adequately.

## CONCLUSION

For all the foregoing reasons, it is respectfully submitted that the Second Amended

Complaint should be dismissed in its entirety with prejudice.[19]

Respectfully submitted, this 24th day of October, 2014.

> /s/ John D. Roesser
> John D. Roesser
> Todd R. David
> Jessica P. Corley (*Admitted Pro Hac Vice*)
> Louis A. Russo
> Joseph G. Tully
> ALSTON & BIRD LLP
> 90 Park Avenue
> New York, New York 10016
> Telephone: (212) 210-9400
> Facsimile: (212) 210-9444
> *Counsel for Defendants*

---

[19] Because the Second Amended Complaint fails to plead a primary violation, the Section 20(a) claim should also be dismissed with prejudice. *See, e.g.*, *Abely v. Aeterna Zentaris Inc.*, No. 12-Civ.-4711-PKC, 2013 WL 2399869, at *20 (S.D.N.Y. May 29, 2013).