## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re Amtrust Financial Services, Inc. Securities Litgation** | **Civil Action No.: 14-CV-736 (VEC)**<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>**<u>CLASS ACTION</u>** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | |

**TABLE OF CONTENTS**

SUMMARY .................................................................................................................................. 1

STATEMENT OF FACTS ........................................................................................................... 1

ARGUMENT .............................................................................................................................. 5

I.    LEGAL STANDARD ......................................................................................................... 5

II.   THE COMPLAINT ADEQUATELY ALLEGES MATERIALLY FALSE AND
MISLEADING STATEMENTS AND OMISSIONS ................................................................. 6

    a.   The Complaint specifies the false or misleading statements, identifies the speaker, and
    states where and when the statements were made .................................................................. 6

    b.   The Complaint Pleads that AmTrust Violated GAAP ................................................... 12

III.  THE COMPLAINT ADEQUATELY ALLEGES SCIENTER .................................... 18

IV.   IV. THE COMPLAINT PLEADS LOSS CAUSATION ............................................. 23

V.    THE COMPLAINT ADEQUATELY PLEADS A SECTION 11 CLAIM ................... 25

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*,
   291 F.3d 336 (5th Cir. 2002) ............................................................................................ 11

*Acticon AG v. China North East Petrol. Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ............................................................................................... 25

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
   No. 13-CV-5586 VEC, 2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014) ............................... 16

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ............................................................................................... 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................... 5

*Cosmas v. Hassett*,
   886 F.2d 8 (2d Cir. 1989) ............................................................................................. 6, 20

*Dobina v. Weatherford International Ltd*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012) ............................................................................... 21

*Dura Pharmaceuticals, Inc., v. Broudo*
   544 U.S. 336 (2005) ......................................................................................................... 23

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ............................................................................................. 13

*Frederick v. Mechel OAO*,
   475 F. App'x 353 (2d Cir. 2012) ....................................................................................... 20

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000) ....................................................................................... 16, 18

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ........................................................................................................... 6

*Ho v. Duoyuan Global Water, Inc.*
   887 F.Supp.2d 547 (S.D.N.Y. 2012) ........................................................................... 11, 20

*Howard v. Everex Systems, Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ......................................................................................... 23

*In re Advanced Battery Technologies, Inc. Sec. Litig.*,
   No. 11 CIV. 2279 CM, 2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012) ................... 11, 12, 19

*In re Aetna Inc. Sec. Litig.*,
   34 F. Supp. 2d 935 (E.D. Pa. 1999) ................................................................................. 13

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
   93 F. Supp. 2d 424 (S.D.N.Y. 2000)...................................................................22

*In re Ambac Fin. Grp., Inc. Sec. Litig*.,
   693 F.Supp.2d 241 (S.D.N.Y. 2010).....................................................................6

*In re Atlas Air Worldwide Holdings, Inc. Secs*.,
   324 F.Supp.2d 474 (S.D.N.Y.2004)....................................................................20

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig*.,
   No. 09 MD 02058, 2011 WL 3211472 (S.D.N.Y. July 29, 2011) .......................19

*In re eSpeed, Inc. Sec. Litig*.,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006).................................................................23

*In re Fannie Mae 2008 Sec. Litig.*,
   742 F. Supp. 2d 382 (S.D.N.Y. 2010)...................................................................5

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009)...........................................................17, 25

*In re Initial Pub.Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003).....................................................................6

*In re JP Morgan Chase Sec. Litig.*,
   No. 02 CIV. 1282 SHS, 2007 WL 950132 (S.D.N.Y. Mar. 29, 2007) .................13

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
   No. 13 CIV. 1307 KBF, 2014 WL 585658 (S.D.N.Y. Feb. 14, 2014)..................24

*In re Lehman Bros. Secs. and Erisa Litig.*
   799 F.Supp.2d 258 (S.D.N.Y.2011)...............................................................18, 20

*In re Longtop Financial Technologies Ltd. Secur.Litig.*,
   2012 WL 2512280 (S.D.N.Y. 2012)....................................................................20

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
   No. 13 CV 214 HB, 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014)...................... 4, 23

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)....................................................................7

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010)..................................................................16

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000)...................................................................13

*In re Morgan Stanley Information Fund Secur.Litig.*,
   592 F.3d 347 (2d Cir. 2010)................................................................................25

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).................................................................24

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    51 F. Supp. 2d 290 (S.D.N.Y. 1999)........................................................13

*In re Pall Corp.*,
    No. 07-CV-3359 (JS)(ARL), 2009 WL 3111777 (E.D.N.Y. Sept. 21, 2009).......................19

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)...................................................................6

*In re Silvercorp Metals, Inc. Sec. Litig.*,
    No. 12-CV-9456 JSR, 2014 WL 2839440 (S.D.N.Y. June 23, 2014)..........................19

*In re Time Warner, Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993)...................................................................23

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000)..................................................6, 22

*In re Tyco Int'l, Ltd.*,
    No. 02-266-B, 2004 WL 2348315 (D.N.H. Oct. 14, 2004)..................................12

*In re Vivendi Universal, S.A.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003).......................................................16

*In re Winstar Commun.*,
    2006 WL 473885 (S.D.N.Y. 2006)...........................................................23

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004).......................................................18

*Institutional Investors Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009).................................................................21

*Kronfeld v. Trans World Airlines, Inc.*,
    832 F.2d 726 (2d Cir.1987)...................................................................18

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)....................................................................6

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011).................................................................16

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F.Supp.2d 105 (S.D.N.Y.2013)......................................................11, 19

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993)....................................................................7

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC,*
709 F.3d 109 (2d Cir 2013) ..............................................................................17

*Nguyen v. Radient Pharmaceuticals Corp.,*
946 F.Supp.2d 1025 (C.D.Cal. 2013) .................................................................23

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000) ..................................................................6, 19, 20, 22

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
380 F.3d 1226 (9th Cir. 2004) ...........................................................................19

*Reese v. Malone,*
747 F.3d 557 (9th Cir. 2014) .............................................................................21

*Rombach v. Chang,*
355 F.3d 164 (2d Cir. 2004) ..............................................................................25

*Stone v. Travis,*
No. 05 CIV. 6249(RPP), 2006 WL 334648 (S.D.N.Y. Feb. 9, 2006) .....................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007) ....................................................................................18, 23

*Van Dongen v. CNinsure Inc.*
951 F.Supp.2d 457 (S.D.N.Y. 2013) ..................................................................12

## STATUTES

15 U.S.C. § 77k(a) ...........................................................................................17

15 U.S.C. § 78u–4(b)(2) ...................................................................................18

**SUMMARY**

AmTrust presents itself as a modern miracle. Since its 1998 inception it has outperformed all of its peers, some of whom have been in business for a more than a century. Yet insurance business fundamentals haven't changed in all that time. AmTrust reports fast growing revenue, even as revenue declines throughout the insurance industry. It reports loss ratios well below the industry average even though it is underwriting the identical risk as its peers and at lower premium rates –which are necessary for it to achieve revenue growth in a declining market.

AmTrust's increasing revenues amidst declining premium rates have spawned ever increasing losses that threaten to consume it. To deceive investors, AmTrust first made unrealistically low estimates of its future losses. Then, when its actual losses exceeded the unrealistic estimates it had made, AmTrust misclassified them on its financial statements to convince investors the losses did not arise from its core business. Meanwhile, AmTrust has kept itself afloat by capital raises – over $600 million during the Class Period – and by increasing its revenues from writing more and more unsustainable policies.

The truth was revealed by Geoinvesting when it showed that the sum of the total losses AmTrust's subsidiaries reported in their financial statements filed with insurance regulators exceeds by $290 million the aggregate losses AmTrust reported to the SEC in its consolidated financial statements for 2010-2012. Yet the sum of premium revenue reported by its subsidiaries to regulators matches almost exactly to the premium revenue AmTrust reported to the SEC. The only conclusion to be drawn from these facts is that AmTrust has committed fraud. Defendants offer no alternative explanation. Defendants' motion to dismiss should be denied.

**STATEMENT OF FACTS**

AmTrust is an insurance company operating in a variety of markets, primarily general property and casualty, workers compensation, product warranty and specialty risk. ¶3.[1] It owns

---

[1] Citations to "¶_" or "Cmplt Ex.__" are to paragraphs of and Exhibits to the Consolidated Amended Complaint filed as Dkt. 35. Citations to "Tully Ex __" are to Exhibits to the Declaration of Joseph G. Tully, Dkt. # 44. Citations to "Rosen Dec. Ex. __" are to the Declaration of Laurence M. Rosen, filed herewith. Citations to "MTD at __" are to pages of the

eleven domestic insurance subsidiaries, and one in each of Bermuda, the UK, Ireland, and Luxembourg. Its Luxembourg subsidiary owns nine captive Luxembourg insurance subsidiaries.¶¶57-59. Defendant Zyskind is AmTrust's CEO, President and director.¶43 Pipoly is AmTrust's Chief Financial Officer.¶44. Both Zyskind and Pipoly have extensive oversight over and knowledge of AmTrust insurance underwriting business, and in particular, its profitability. ¶¶127-29.

Investors evaluate the performance of insurance companies based on specific metrics. These include underwriting income, loss ratio, expense ratio and combined ratio.¶6. These metrics, other than expense ratio, are all direct functions of the insurer's loss and loss adjustment expense or "L/LAE". L/LAE are losses resulting from current payments and estimated future payments for insurance claims.¶9. L/LAE are the largest expense item and are the main driver of AmTrust's operating costs and profits.¶9.

An insurance company's underwriting income is its Net Earned Premium less (i) L/LAE and (ii) acquisition costs and other underwriting expenses.¶9. Loss ratio is L/LAE divided by Net Earned Premium.¶11. Loss ratio shows what percentage of its premium revenue the insurer is paying out as claims, and hence the profitability of its underwriting and claims adjustment practices. Expense ratio is acquisition costs and other underwriting expenses of acquiring, writing, and servicing insurance polies divided by premium revenue.¶12. Expense ratio shows the efficiency of an insurance underwriters' sales and administrative practices. Combined ratio sums the two to show what percentage of premium revenue is being paid for L/LAE and acquisition costs and other underwriting expenses.¶13. If the combined ratio is above 100%, the underwriting business is not profitable. The purpose of these metrics is to give investors a clear picture of the profitability of the core insurance underwriting business devoid of the results from investments and other non-underwriting activities.

---

Memorandum of Law In Support of Defendants' Motion to Dismiss Plaintiffs' Second Consolidated Amended Complaint, Dkt. # 43.

2

Management has control over the reporting of L/LAE because it exercises its judgment in estimating the future costs of claims. Because underwriting income is a direct function of L/LAE, management can manipulate underwriting income by making unrealistically low estimates of the future costs of resolving claims.¶16 Management can thus determine what operating profits the company reports to investors. During the eight years preceding the close of the class period, the insurance industry was suffering decreasing aggregate revenues and declining premium rates, but AmTrust reported ever increasing revenue and income.¶¶152-154; Cmplt. Exs. A, B, C. When the market is soft, insurers cut premium rates to attract business. And AmTrust has had to undercut its competitors by charging lower rates for identical risks, in order to grow its revenue in a declining market.¶21. Selling more and more insurance policies that are less profitable than its competitors' should result in higher than industry average loss ratios for AmTrust not consistently lower loss ratios.[2] ¶21 But AmTrust has consistently reported loss ratios and combined ratios that are materially lower than the industry average.¶17, Cmplt. Exs. E, F, G.

AmTrust employed two ruses to hide its mounting losses. First, it selected unreasonably low actuarial estimates of future costs of claims, which resulted in understating L/LAE.¶¶15-18, 156. Second, it ceded or transferred about $100 million of L/LAE each year to its Luxembourg subsidiaries. In the consolidation process, instead of recognizing the $100 million ceded to Luxembourg as L/LAE on its income statement, AmTrust misclassified the L/LAE as non-underwriting expenses.¶¶24, 136-147. Thus, by understating L/LAE, AmTrust inflated underwriting income, and understated its loss ratio and combined ratio - the key measures used by investors and analysts to assess the profitability and value of an insurance company.¶14

Even though AmTrust can understate its L/LAE thereby hiding its operating losses from its investors, eventually, the unrealistically low estimates of future losses become current losses that

---

[2]   This is because loss ratio is L/LAE divided by Net Premium Earned.  Net Premium Earned per policy declines as premium rates decline.  Thus, if L/LAE remains the same and Net Premium Earned declines, the loss ratio increases.

AmTrust must pay.¶22 AmTrust has avoided its day of reckoning by rapidly growing its premium revenue and raising $600 million in debt and equity during the Class Period, providing it with the cash to pay the higher than estimated claims as they come due and to continue to mask the true L/LAE incurred.¶¶22, 23,185

AmTrust's fraudulent scheme was first revealed in a report published by Geoinvesting on December 12, 2013 (the "Geoinvesting Report").[3] ¶¶25, 92, 201.Geoinvesting obtained the statutory financial reports that AmTrust's individual subsidiaries file with insurance regulators, as well financial statements filed with Bermuda and European regulators (the "Statutory Reports"). Geoinvesting compared the total premium revenue and L/LAE AmTrust's individual subsidiaries reported to regulators against the premium revenue and L/LAE AmTrust reported in its consolidated financial statements with the SEC. While the net and gross premium revenue matched, the L/LAE reported to the SEC was $289.9 million less than the amount that AmTrust's individual subsidiaries reported to regulators for fiscal years 2010-2012. ¶25.

Geoinvesting theorized that AmTrust had concealed these $289.9 million in operating losses by ceding them to its Luxembourg subsidiaries, where they were not recognized as operating losses, in compliance with Luxembourg GAAP but in violation of U.S. GAAP.[4] Geoinvesting correctly surmised that AmTrust hid its operating losses by ceding them to its Luxembourg entities, but incorrectly surmised that AmTrust's accounting treatment was justified by Luxembourg GAAP. ¶143. Throughout their brief, Defendants grumble that Plaintiffs have abandoned Geoinvesting's theory, while carefully avoiding specifying how the theories differ. The Complaint alleges AmTrust violated US GAAP by misclassifying the $290 million of L/LAE as non-underwriting losses during the consolidation process, while Geoinvesting asserts

---

[3] Defendants' rhetoric notwithstanding, "courts in this district frequently accept allegations based on short-seller reports at [the pleadings stage]." *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 CV 214 HB, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (assuming facts pled in reliance on short seller Geoinvesting are true because reliability is a question of fact the Court may not determine on a motion to dismiss).

[4] GAAP are generally accepted accounting principles, and sometimes vary by country. ¶¶62-63.

that AmTrust violated US GAAP by wrongly following Luxembourg GAAP and using the equalization reserves to eliminate improperly $290 million of L/LAE.¶¶26-27. The essence of both Geoinvesting and the Complaint's theories is that AmTrust violated US GAAP by failing to report $290 million of L/LAE ceded to AmTrust's Luxembourg subsidiaries.

Geoinvesting's allegations that AmTrust had underreported L/LAE of almost $100 million per year for three years caused AmTrust's common stock price to immediately decline $4.63/share or 12%.¶32. The price of AmTrust's Series A preferred stock also declined $2.55/share that same day.¶¶32,93-94. AmTrust immediately responded by calling the Geoinvesting Report false.¶95. AmTrust also initiated a stock repurchase program to increase AmTrust's share price.¶¶96,102. Despite AmTrust's denials of Geoinvesting's claims, both to the markets and in this litigation, AmTrust has never explained how it is possible for the premium revenue reported by its individual subsidiaries to match its consolidated premium revenue, while the L/LAE reported by the individual subsidiaries is $289.9 million greater than its consolidated L/LAE for fiscal 2010-2012. It has never provided an explanation because the only plausible explanation is that AmTrust has been concealing its underwriting losses by transferring them to its Luxembourg subsidiaries and then misclassifying these losses as non-underwriting expenses in the consolidating process, in violation of GAAP.

## ARGUMENT

### I.     LEGAL STANDARD

In ruling on a motion to dismiss, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), *see also In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 394 (S.D.N.Y. 2010) (internal citations omitted). The court only "assess[es] the legal feasibility of the complaint;" it does not "assay the weight of the evidence which might be offered in support thereof." *Fannie Mae*, 742 F. Supp. 2d at 394 (internal quotation omitted). Thus, to survive a Rule 12(b)(6) motion, the Complaint need only contain sufficient facts "to state a claim of relief that is plausible on its face." *Twombly,* 556 U.S. at 555.

Section 11 of the Securities Act "was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *In re Initial Pub.Offering Sec. Litig.*, 241 F. Supp. 2d 281, 343 (S.D.N.Y. 2003) (internal quotations omitted). It accordingly places a "relatively minimal burden on a plaintiff, requiring simply that the plaintiff allege that he [1] purchased the security and that [2] the registration statement contains false or misleading statements concerning a material fact." *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000)(*citing and quoting Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82 (1983)). Even if triggered by a pleading that sounds in fraud, Rule 9(b) only imposes on a plaintiff the obligation to specify the false statements, identify the speaker, state *where* and when the statements were made, and explain why they were fraudulent. *Cosmas v. Hassett*, 886 F.2d 8, 12 (2d Cir. 1989).

To state a claim under Rule 10b-5, Plaintiff must allege that Defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. *Lentell v. Merrill Lynch & Co., Inc*., 396 F.3d 161, 172 (2d Cir. 2005); *In re Ambac Fin. Grp., Inc. Sec. Litig*., 693 F.Supp.2d 241, 263-64 (S.D.N.Y. 2010). Although securities fraud actions are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, et seq., and Fed. R. Civ. P. 9(b*)*, a plaintiff is not required to plead "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 72 (2d Cir. 2001), but simply sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000).

## II.     THE COMPLAINT ADEQUATELY ALLEGES MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

> *a.   The Complaint specifies the false or misleading statements, identifies the speaker, and states where and when the statements were made*

To plead with particularity is no more than to *specify the false or misleading statements*, identify the *speaker*, state *where* and *when* the statements were made, and state *why* they were false or misleading. *Stone v. Travis*, No. 05 CIV. 6249(RPP), 2006 WL 334648, at *2 (S.D.N.Y. Feb. 9, 2006) (*citing Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).A defendant who signs an SEC filing "makes" the statements it contains. *In re Marsh &McLennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 479 (S.D.N.Y. 2006)

Defendants' misleading statements are identified in the Complaint. On its income statement, AmTrust understated its loss and loss adjustment expense ("L/LAE") over a three year period. These misstatements resulted in AmTrust overstating underwriting income and understating its loss ratio and combined ratio, which are all very important metrics of an insurance company's performance and value.¶¶68-85. The Complaint also states where and when they were made: among other places, in AmTrust's 10-Ks, which were signed by Pipoly and Ziskind.¶¶70,76. The Complaint provides a chart detailing the precise dollar amount, to the nearest thousand of each understatement of L/LAE and each overstatement of underwriting income. In addition, it specifies to one-tenth of a percent each percentage point understatement of loss ratio and combined ratio. The Complaint provides three charts identifying each misstatement by fiscal year:

| Dollars in thousands | As reported 2010 | As corrected 2010 | Absolute Difference | Percentage Difference |
|---|---|---|---|---|
| Net Earned Premium | 745,659 | 745,659 | | |
| Ceding Commission (Related Party) | 138,261 | 138,261 | | |
| | | | | |
| Loss and loss adjustment expense | 471,481 | 542,451 | -70,970 | -15.1% |
| Acquisition costs and other underwriting expenses | 302,809 | 302,809 | | |
| | | | | |
| Underwriting income | 109,630 | 38,660 | 70,970 | 283.6% |
| | | | | |
| Underwriting income Key Measures: | | | | |
| Net Loss Ratio | 63.2% | 72.7% | 9.5% | 15.1% |
| Net expense Ratio | 22.1% | 22.1% | | |
| Combined Ratio | 85.3% | 94.8% | 9.5% | 11.2% |

¶73

| Dollars in thousands | As reported 2011 | As corrected 2011 | Absolute Difference | Percentage Difference |
|---|---|---|---|---|
| Net Earned Premium | 1,036,861 | 1,036,861 | | |
| Ceding Commission (Related Party) | 153,953 | 153,953 | | |
| | | | | |
| Loss and loss adjustment expense | 678,333 | 780,633 | -102,300 | -15.1% |
| Acquisition costs and other underwriting expenses | 398,404 | 398,404 | | |
| Underwriting income | 114,077 | 11,777 | 102,300 | 968.6% |
| | | | | |
| Underwriting income Key Measures: | | | | |
| Net Loss Ratio | 65.4% | 75.3% | 9.9% | 15.1% |
| Net expense Ratio | 23.6% | 23.6% | | |
| Combined Ratio | 89.0% | 98.9% | 9.9% | 11.1% |

¶79

| Dollars in thousands | As reported 2012 | As corrected 2012 | Absolute Difference | Percentage Difference |
|---|---|---|---|---|
| Net Earned Premium | 1,418,852 | 1,418,852 | | |
| Ceding Commission (Related Party) | 196,982 | 196,982 | | |
| | | | | |
| Loss and loss adjustment expense | 922,675 | 1,039,375 | -116,700 | -12.6% |
| Acquisition costs and other underwriting expenses | 543,713 | 543,713 | | |
| Underwriting income | 149,446 | 32,746 | 116,700 | 456.4% |
| | | | | |
| Underwriting income Key Measures: | | | | |
| Net Loss Ratio | 65.0% | 73.3% | 8.2% | 12.6% |
| Net expense Ratio | 24.4% | 24.4% | | |
| Combined Ratio | 89.5% | 97.7% | 8.2% | 9.2% |

¶85

The Complaint also details the reasons why the statements were false and misleading. The principal evidence that AmTrust understated its L/LAE is that the financial statements for its individual subsidiaries that it filed with insurance regulators show combined aggregate losses that are materially greater than the combined aggregate losses AmTrust reported in its consolidated financial statements filed with the SEC. ¶116-¶120. The Complaint includes a chart that details the amount of premium revenue (NPW, NPE) and L/LAE each individual AmTrust subsidiary reported in filings with insurance regulators against the amounts AmTrust reported in

its consolidated financial statements filed with the SEC. ¶116. The chart shows that while the combined aggregate premium revenue (both NPW and NPE) reported by AmTrust's individual subsidiaries with insurance regulators is equal to the combined aggregate premium revenue (both NPW and NPE) reported in its SEC filings, the combined aggregate L/LAE AmTrust's subsidiaries reported to insurance regulators is materially greater than the L/LAE AmTrust reported in its consolidated financial statements filed with the SEC.

| 2012 NPE & LAE | US Subs | AEL | AIUL | All | ACHL | Total per AM Best and Sched. Y | 10K Consolidated | Difference |
|---|---|---|---|---|---|---|---|---|
| NPW | 487.20 | 190.08 | 40.95 | 934.67 | - | 1,652.90 | 1,648.04 | (4.86) |
| NPE | 403.10 | 163.91 | 34.64 | 821.37 | - | 1,423.02 | 1,418.85 | (4.17) |
| Net L/LAE | 291.05 | 95.03 | 31.30 | 535.08 | 86.91 | 1,039.37 | 922.68 | (116.70) |
| Source: | AM Best | AM Best | AM Best | AM Best | TIC Sched Y | N/A | 10K | N/A |

| 2011 NPE & LAE | US Subs | AEL | AIUL | All | ACHL | Total per AM Best and Sched. Y | 10K Consolidated | Difference |
|---|---|---|---|---|---|---|---|---|
| NPW | 361.63 | 172.32 | 33.09 | 701.40 | - | 1,268.44 | 1,276.60 | 8.15 |
| NPE | 302.05 | 128.05 | 29.08 | 568.70 | - | 1,027.88 | 1,036.86 | 8.98 |
| Net L/LAE | 232.25 | 51.78 | 26.72 | 373.83 | 96.06 | 780.63 | 678.33 | (102.30) |
| Source: | AM Best | AM Best | AM Best | AM Best | TIC Sched Y | N/A | 10K | N/A |

| 2010 NPE & LAE | US Subs | AEL | AIUL | All | ACHL | Total per AM Best & Sched. Y | 10K Consolidated | Difference |
|---|---|---|---|---|---|---|---|---|
| NPW | 289.04 | 95.23 | 29.72 | 412.03 | - | 826.02 | 827.23 | 1.21 |
| NPE | 255.37 | 67.55 | 25.47 | 395.04 | - | 743.44 | 745.66 | 2.22 |
| Net L/LAE | 174.31 | 28.97 | 27.52 | 249.53 | 62.12 | 542.45 | 471.48 | (70.97) |

The charts show that AmTrust understated its Net L/LAE in its 10-K filed with the SEC by approximately $70.97 million, $102.3 million and $116.7 million for fiscal years 2010, 2011 and 2012 respectively.¶119. AmTrust understated its L/LAE a total of $289.9 million over three years. ¶120. Had AmTrust reported Net L/LAE to the SEC in the same amounts as it did with

insurance regulators, its underwriting income would have been materially reduced by 65%, 89.7% and 78% in 2010, 2011 and 2012 respectively.¶120. Similarly, on its balance sheet, the sum of the net L/LAE Reserves reported for its individual subsidiaries to insurance regulators materially exceeds the net L/LAE Reserves reported in its consolidated balance sheet.[5] ¶125. The subsidiaries' income statements clearly eliminate intercompany transactions - the subsidiaries' income statements and the unearned premiums[6] on each subsidiary's balance sheet match the amounts for NPE and unearned premium reported in AmTrust's consolidated financial statements. But the L/LAE on the subsidiaries income statements and the net L/LAE reserves on the balance sheet show materially greater L/LAE and net L/LAE reserves for the unconsolidated subsidiaries. Hence, AmTrust is not recognizing the true amount of its losses in its consolidated financial statement.[7] ¶¶121, 126.

Consolidation is simply adding together the results of individual companies and presenting them in a single set of financial statements. ¶136. AmTrust's Statutory Reports already have eliminated all intercompany transactions. ¶142. The L/LAE of the subsidiaries must equal the L/LAE of the consolidated parent entity. ¶137-¶143.

The Defendants' first motion to dismiss filed with the Court asserts that "the Company has not 'hidden' any losses, but rather has properly eliminated a transaction between subsidiaries—losses ceded by AmTrust Bermuda and assumed by the subsidiaries in Luxembourg—as part of

---

[5]Net L/LAE reserves are established for the unpaid cost of insured events that have occurred as of a point in time. More specifically, the reserves for insurance losses and loss adjustment expenses represent the accumulation of estimates for both reported losses and those incurred but not reported, including claims adjustment expenses relating to direct insurance and assumed reinsurance agreements. ¶123, fn11.

[6]  Net Unearned Premium is the premium corresponding to the time period remaining on an insurance policy, less that portion ceded to reinsurers under reinsurance agreements. Unearned premiums are proportionate to the unexpired portion of the risk, for which coverage has been sought by the insured party. Thus, it is deemed to have not yet been earned by the insurer.

[7]This analysis is persuasive because L/LAE, NPW and NPE that AmTrust reported in the financial reports it filed with insurance regulators are calculated in the identical manner that NPW, NPE, L/LAE, unearned premium and net L/LAE reserves are calculated under U.S. generally accepted accounting principles, which AmTrust is obligated to follow when it consolidates and reports its financial statements with the SEC. ¶115¶124, fn13.

the consolidation process under GAAP." (Docket #33, pgs. 14-15) Thus, the Defendants assert that losses of approximately $289.9 million had been "eliminated" in consolidation and not through other means of accounting.¶138. Under GAAP, the elimination of intercompany premium revenue and L/LAE should have a zero net effect on AmTrust's premium revenue and L/LAE and underwriting income in the consolidated financial statements.¶140. For AmTrust, recording of elimination entries for NPE and for L/LAE, as they relate to reinsurance contracts between consolidated subsidiaries, would have been unnecessary because premiums ceded by one AmTrust's subsidiary to another AmTrust Subsidiary are recorded on the same income statement line. The same is true for loss and loss adjustment expenses.¶141. Therefore, during consolidation, there is no need to record elimination entries for these transactions and the consolidated amounts should be the sum of the NPE and the L/LAE reported by individual subsidiaries (i.e., the total should be the sum of its parts). Premium and losses from each insurance policy must be counted and reported once (and only once) on the consolidated financial statements. ¶142 That the total premium reported by AmTrust's subsidiaries matches almost to the dollar the total premium reported in its consolidated financial statements, while the total L/LAE show about $100 million difference in each fiscal year 2010 through 2012 proves that AmTrust is not following GAAP when it consolidates its financial statements. ¶121.

Courts routinely have found sufficient evidence of falsity is demonstrated by allegations that the aggregate revenue or profit of an issuer's individual subsidiaries' financial statements filed with regulators materially differed from the consolidate revenues reported to the SEC. *Ho v. Duoyuan Global Water, Inc.* 887 F.Supp.2d 547, 568 (S.D.N.Y. 2012); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F.Supp.2d 105, 125-126 (S.D.N.Y.2013); *In re Advanced Battery Technologies, Inc. Sec. Litig.*, No. 11 CIV. 2279 CM, 2012 WL 3758085, at *10 (S.D.N.Y. Aug. 29, 2012); *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 345, 356 357 (5th Cir. 2002) (internal subsidiary-level reports, dubbed "MMRs", that were prepared for each of parent's subsidiaries containing profitability metrics adequately pled defendants' knowledge of declining profitability); *In re Tyco Int'l, Ltd.*, No. 02-266-B, 2004 WL 2348315, at

*10 (D.N.H. Oct. 14, 2004) (plaintiff who alleged that defendant had committed accounting fraud by overstating financial metrics of companies it acquired met PSLRA pleading requirements by pointing to machinations in financial statements of acquired companies).

Defendants' assertions that AmTrust's accounting treatment is appropriate are premature fact-based defenses that must await discovery and expert analyses. *Van Dongen v. CNinsure Inc*. 951 F.Supp.2d 457, 470 (S.D.N.Y. 2013) (inappropriate to make findings on inadequate evidentiary record); *Advanced Battery*, 2012 WL 3758085, at *9 (noting that defendants' argument predicated on assertion "that the things they said were true .... is not an appropriate argument to make on a motion to dismiss a Complaint that alleges falsity; it is a defense on the merits").

### b. The Complaint Pleads that AmTrust Violated GAAP

That AmTrust violated GAAP by failing to include and report in its consolidated financial statements all of its L/LAE is evidenced by the chart in ¶116 which lists the premium and losses reported by each subsidiary to insurance regulators. The premium and losses reported in ¶116 already account for the effect of any intercompany transactions. Thus, the sum of the premium revenue and losses and loss adjustment expense reported in the chart in ¶116 should match the total premium revenue and loss and loss adjustment expense reported in AmTrust's consolidated financial statements for fiscal years 2010, 2011 and 2012. ¶142. That it doesn't shows AmTrust violated GAAP by not recording elimination entries properly. ¶143

The Complaint goes on to identify the specific GAAP AmTrust violated.¶¶144-145. AmTrust violated GAAP and the federal securities laws when it misclassified L/LAE incurred by its subsidiaries as other unrelated line items on its consolidated income statement.¶143-¶146. This violation misled investors to believe that AmTrust's insurance operations were far more profitable than they truly were.¶147.

AmTrust's assertion that it properly reported L/LAE according to GAAP because neither its auditor, nor the SEC, has required it to restate its financial statements is meritless. In fact, though a restatement is sufficient to plead falsity, it is not necessary. *In re Oxford Health Plans, Inc. Sec.*

*Litig.*, 51 F. Supp. 2d 290, 292 (S.D.N.Y. 1999) (denying motion to dismiss in accounting fraud case though there was no restatement); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 956 (E.D. Pa. 1999) (same). Rather, a complaint charging accounting fraud pleads that the accounting figures were false if it pleads that the company misapplied GAAP, which a plaintiff could prove simply by pointing to a restatement, but also by making a showing based on GAAP itself. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000). Indeed, *JPMorgan*, the only case Defendants cite, is inapposite, since there the issue was whether a restatement established scienter, not falsity. *In re JP Morgan Chase Sec. Litig.*, No. 02 CIV. 1282 SHS, 2007 WL 950132, at *13 (S.D.N.Y. Mar. 29, 2007). And in affirming the district court, the Second Circuit discussed at length the Plaintiffs' claims that the accounting treatment was incorrect without even mentioning that there was no restatement. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 200 (2d Cir. 2009). If it were enough that there was no restatement, the panel would have just said so and ended its opinion there. Secondly, the New York Department of Insurance has required AmTrust to engage a new auditor because it doesn't believe its current auditor (BDO) has the necessary experience to audit AmTrust's international operations. (Rosen Dec. Ex. 1 AmTrust Sept. 12, 2014 8K). Moreover, the SEC has already found errors in AmTrust's financial statements requiring correction. Defendants' brief claims that "[i]mportantly", the SEC had never required that Defendants "acknowledge any errors" in their financial statements. (Br. at 8). Their claim is not only wrong, it is belied by the very SEC filing Defendants cite in support. The SEC recently required AmTrust to admit that its financial statements contained material errors which required correction.¶186-¶191. The SEC found that AmTrust had been misclassifying related party ceding commission as revenue and forced AmTrust to reclassify it as a reduction of acquisition costs and other underwriting expenses.¶186. In addition to errors in reporting premium revenue, the SEC found AmTrust made errors in accounting for the utilization of its equalization reserves in its Luxembourg subsidiaries. (Tully Dec. Ex. 13, Letter to SEC dated December 4, 2013, at 10; Rosen Dec., Ex. 2, Letter to SEC dated January 16, 2014 at 11). The SEC insisted that AmTrust

acknowledge in writing that its accounting treatment was an error in violation of US GAAP. ¶188 (See Tully Dec. Ex. 12 Letter to SEC dated June 20, 2014, at 3). Defendants "confirm[ed] our understanding that the revisions made [] were corrections of errors." *Id*. That SEC filing, incidentally, is a letter signed by Defendant Pipoly, who thus has personal knowledge that the assertions in his brief that he did not admit error are inaccurate. AmTrust's accounting misclassifications had the effect of overstating underwriting income by 31% in 2011 and 14% in 2012 and its expense ratio by more than 10%. ¶190.

In its correspondence, the SEC stated that the errors appeared to be material – meaning that AmTrust must restate its financial statements. (Ex. Tully Dec. Ex. 10, Letter to SEC dated April 8, 2014, at 1; Ex. 12, Letter to SEC dated June 20, 2014, at 3, Ex. 7 SEC Letter dated June 23, 2014) AmTrust agreed to correct these errors in future SEC filings, but argued that the errors were not material enough to warrant restatement of *prior* financial statements. *Id*. While the SEC has not brought an enforcement action to *force* a restatement (likely because AmTrust agreed to correct the errors in future SEC filings), the SEC stated "our comments or changes to disclosure in response to our comments do not foreclose the Commission from taking any action with respect to the company or the filing". Lastly, the SEC specifically stated and AmTrust acknowledged that "the company may not assert staff comments as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States." Yet that is exactly what AmTrust is doing. (Tully Dec. Exs. 7, 12, SEC Letter dated June 23, 2014 and Letter to SEC dated June 20, 2014, 7;)

A.  Plaintiffs Plead Additional Corroborating Reasons Showing AmTrust Concealed L/LAE

Plaintiffs allege additional facts corroborating that AmTrust has lied about its L/LAE to mislead investors that its insurance operations are more profitable than they really are.¶148-¶175. AmTrust and its CEO are newcomers to the insurance business, having entered the business in 1998.¶148. In the past five years, AmTrust has experienced explosive growth, by underpricing its competitors, but it claims to have lower loss ratios than the industry average. ¶151-¶152,¶154. AmTrust is thus achieving the impossible. It is *charging less* than its

competitors to underwrite *identical risk* and it is reporting materially lower losses from that identical risk.  ¶152- ¶155.

> But given the law of large numbers, there is absolutely no basis to believe that the workers, products or property that AmTrust insures will be injured less, break less or be damaged less than those that its competitors insure.  Nor is there any basis to suggest that AmTrust is able to charge more for its policies.  On the contrary, in order to achieve such spectacular growth in gross premiums written, in the last ten years, AmTrust has consistently been underpricing its policies relative to its competitors.

¶155. The Complaint includes a number of charts and exhibits that show AmTrust is improperly selecting unrealistically low loss estimates for its insurance policies.¶152-154; ¶168-172. For example, AmTrust's stated reserves at year-end 2012 were $2,426,400,000. Had AmTrust used industry average loss ratios in accounting for future losses during the period 2007-2012, its loss reserves would have been $2,992,563,000.¶156. Thus, had AmTrust used the same industry average loss ratios to calculate its reserves, it would have reported an additional $566,163,000 in losses from 2007 to 2012.¶156. As another example, had AmTrust estimated its IBNR losses using the U.S average (countrywide) or the California average (where much of its business is based), it would have reported IBNR losses of $22.4 million and $52.4 million greater from 2007 through 2013.¶168. Yet AmTrust has been consistently underpricing its competitors to gain market share.¶172. AmTrust's lower revenue per dollar of assumed premium risk cannot result in such consistently lower loss ratios, particularly given its 400% revenue growth in a shrinking market.¶172. To cover up its unrealistic loss estimates, AmTrust misclassified $290 million of L/LAE to conceal the true costs of claims incurred as the chickens came home to roost.

Tower Insurance and Meadowbrook Insurance are good examples of the truth behind insurers that report consistently better than industry average loss ratios and premium growth. Both reported materially lower loss ratios and more rapid premium growth than the industry average from 2007-2012, before collapsing like a house of cards amidst allegations of fraud. Meadowbrook and Tower ultimately reported an additional $200 million and $470 million of additional losses respectively.  ¶158-¶159; ¶173; Cmplt. Exs. H, I.

B.  Defendants' Truth on the Market Defense is Meritless

Defendants' assertion that the information about its L/LAE was publicly available and thus immaterial is a thinly disguised "truth on the market" defense which "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."[8] *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Indeed, Defendants have not cited a single case in which a court granted dismissal based on truth-on-the-market at the pleading stage. Moreover, courts in this District regularly rely on an immediate stock price drop following disclosure to rule out granting a truth-on-the-market defense as a matter of law, at least in the early stages of litigation. *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (truth-on-the-market defense belied by securities prices decrease following corrective disclosure); *accord In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) (same).

Because the Complaint alleges that the key information needed to identify AmTrust's fraud was not publicly available to investors, (¶¶193-96), determination of whether it was publicly available is not appropriate for motion to dismiss; "Discovery is necessary to resolve several fundamental questions underlying the parties' opposing views, including: (1) how accessible were the [Reports]? (2) how intelligible were the [Reports] to a reasonable, or even a sophisticated, investor? (3) what was the significance of the [Reports]?"). *Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, No. 13-CV-5586 VEC, 2014 WL 6466994, at *9 (S.D.N.Y. Nov. 18, 2014). Here, to complete their analysis and discover AmTrust's fraud, investors would have had to search out and obtain statutory financial statements that AmTrust filed with regulators throughout the world, including Bermuda, Luxembourg and UK. ¶193. And the Bermuda filings were not available from Bermuda regulators for public inspection. ¶196.

---

[8]   Defendants concede that AmTrust's misstatements of L/LAE and underwriting income are quantitatively material. Misstatements that have an impact of 5% or more on financial statement entries are material. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 713 (2d Cir. 2011). Between 2010 and 2012, AmTrust understated its L/LAE by between 12.6% and 15.1% and overstated its underwriting income by between 283.6% and 968.6% –material amounts.¶¶ 73, 79, 85.

In persuading the SEC that it need not restate its financial statements because the errors it corrected were not material, AmTrust asserted in a letter dated May 20, 2014, that the proper way to judge the materiality of new financial information to investors is to evaluate the stock price movement when the information is disclosed to the market and determine whether there is a "significant market reaction, positive or negative" and whether AmTrust was required to "field any questions from investors or analysts about the [disclosures]".[9] Here, the market's immediate and severe negative reaction, followed by numerous investor and analyst inquiries prompting several management responses to the issues raised in the Geoinvesting reports demonstrates that the information in the Geoinvesting reports was new and highly material information for investors.¶105. And given Defendants admissions in SEC correspondence, AmTrust's December 12, 2013 share price drop upon publication of the Geoinvesting Report, along with the resulting analyst and investor inquiries concerning its L/LAE and loss ratios, the materiality of the information in the Geoinvesting Report is indisputable. Moreover, AmTrust's subsidiaries' statutory financial statements were not easily available, they were scattered around the word, and its Bermuda subsidiary's financial statements (AII) – which were critical to completing Geoinvesting' s analyses - were not publicly available. ¶¶196-197.

"The ′33 Act itself implicitly limits the impact of public information on materiality determinations. Section 11 creates an affirmative defense where a defendant can prove that 'at the time of ... acquisition,' the purchaser 'knew' of the alleged 'untruth or omission.'" *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC,* 709 F.3d 109, 127 (2d Cir 2013) (citing 15 U.S.C. § 77k(a)). Thus, "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them." *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 437-38 (S.D.N.Y. 2009) (*quoting Kronfeld v. Trans World Airlines, Inc.,*832 F.2d 726, 736 (2d

---

[9] Attached as Exhibit 11to Defendants' Request for Judicial Notice (Docket #44-11).

Cir.1987)). For example, in *Worldcom*, many news articles disclosed the precise fact that the plaintiff alleged had to be disclosed– that the Department of Justice's antitrust division would recommend against approving the defendant's merger – but Judge Cote nonetheless held that because the press reports were "scattered" or "published in other contexts" they could not be charged to the innocent investors. *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 688 (S.D.N.Y. 2004). Here, the information was scattered in financial statements filed in a host of different jurisdictions, was difficult to obtain, had to be aggregated to be of any use, and was contradicted by AmTrust's SEC-filed financial statements, and *a fortiori* had to be disclosed.

## III.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

Under the PSLRA, a securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The pleading standard is satisfied "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior." *In re Lehman Bros. Securities and ERISA Litig.*, 799 F. Supp. 2d 258, 293 (S.D.N.Y 2011) (*quoting ATSI Commc'ns., Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007)). Plaintiffs need not plead scienter with "great specificity provided the plaintiff alleges enough facts to support a strong inference of scienter." *Ganino*, 228 F.3d at 169 (internal quotations omitted). An inference of scienter is strong "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007) (citations omitted). A court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 323 (emphasis in original). The requisite inference of scienter need not be the "most plausible of compelling inferences," nor does it need to be "irrefutable, i.e., of the 'smoking gun' genre." *Id*. at 324.

The Complaint sufficiently alleges circumstantial evidence to establish a strong inference of scienter through conscious behavior or recklessness. Since *Tellabs*, the Second Circuit has held

that recklessness can suffice to meet pleading requirements for scienter where the complaint sufficiently alleges that the Defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information that they had a duty to monitor." *In re Pall Corp.*, No. 07-CV-3359 (JS)(ARL), 2009 WL 3111777, at *6 (E.D.N.Y. Sept. 21, 2009). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." *Novak*, 216 F.3d at 308 (citations omitted); *see also In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, No. 09 MD 02058, 2011 WL 3211472, at *9 (S.D.N.Y. July 29, 2011) (same). The Complaint meets this standard.

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308-09; *accord Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement"). Thus, a number of courts in this district and in others have held that a strong inference of scienter exists where the issuer has reported materially better financial results in its SEC filings than it has reported in other regulatory filings. *McIntire*, 927 F.Supp.2d at 125-126 ("[T]he reasonable conclusion is that there is a fraudulent motive to overstate the numbers yet no fraudulent motive to understate them"); *In re Silvercorp Metals, Inc. Sec. Litig.*, No. 12-CV-9456 JSR, 2014 WL 2839440, at *5 (S.D.N.Y. June 23, 2014); *Advanced Battery*, 2012 WL 3758085 at *11 (strong inference of scienter based on differences between SEC and SAIC filings).

Defendants admit that "the Second Amended Complaint identifies documents that would have informed the individual defendants about the financial position of each of the Company's separate subsidiaries." MTD at 20. Specifically, Zyskind and Pipoly had ready access to AmTrust's subsidiaries' statutory financial statements filed with insurance regulators that directly contradicted their public statements on investor conference calls, in press releases and

AmTrust's SEC filings, which they each signed.[10] ¶¶127-129. "It is therefore appropriate to impute knowledge of available contrary facts to [the CFO]." *In re Longtop Financial Technologies Ltd. Secur.Litig.*, 2012 WL 2512280, 10-11 (S.D.N.Y. 2012)(finding of scienter based on access to regulatory filings contradicting SEC filings).

L/LAE, underwriting income, and loss ratios are critical measures of AmTrust's financial performance. ¶¶14, 127-129. Under the core operations inference, knowledge of these key metrics can be imputed to AmTrust's key officers Zyskind and Pipoly. *See Duoyuan Global Water, Inc.,* 887 F.Supp.2d at 575 ("'Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued.' ") (*quoting In re Atlas Air Worldwide Holdings, Inc. Secs.*, 324 F.Supp.2d 474, 489-90 (S.D.N.Y.2004) (*citing Cosmas*, 886 F.2d at 13 ) ("[I]f a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company."). *See also Lehman Bros.*, 799 F.Supp.2d at 294 ("A complaint may allege facts sufficient to give rise to an inference of scienter with respect to a misleading financial statement where it alleges that a corporate officer knew of or recklessly failed to learn of "red flags" indicating that the officer's public statements were false or misleading.")[11] Moreover, the falsity of AmTrust's consolidated L/LAE was obvious because it only required summing the L/LAE of its subsidiaries, making it "absurd to suggest that

---

[10]   Consistent with *Novak*, 216 F.3d at 309, the Complaint describes the specific reports filed with insurance regulators that contradicted Defendants' public statements. ¶¶106-111, 114-116. The Complaint also describes the dollar amount of the discrepancies between the reports and AmTrust's SEC filings. ¶¶73, 79, 85, 125, 116.

[11] The Second Circuit has indicated that the core operations inference survived passage of the PSLRA. *Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) (without resolving the issue, noting that Novak's holding that the PSLRA did not change pleading standards in the Second Circuit suggests that it did not alter the core operations inference).

management was without knowledge of the matter." *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014) (citations omitted).[12] But even if the core operations inference by itself is insufficient for scienter, Ziskind and Pipoly discussed these three metrics in conference calls reporting on annual and quarterly earnings, at length, over three years. ¶¶69, 75, 81. (Rosen Dec. Exs. 3-8, AmTrust Conf. Calls Transcripts) The unlikely possibility that Ziskind and Pipoly expounded on these key metrics quarter after quarter and year after year in prepared remarks without reading the Statutory Reports or having knowledge of AmTrust's true L/LAE and loss ratios is not an exculpatory explanation – it is recklessness. *See Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (strong inference of scienter existed where CFO responded to analyst's questions that company performance on key metric was steady though it had collapsed because even if CFO was not aware of performance problems assertion that it had none was reckless).

The nature of the errors the SEC identified in AmTrust's financial statements further demonstrates Pipoly's scienter. The SEC asked AmTrust: what is the effect of its error of misclassifying ceding commission as revenue had on its balance sheet? (Rosen Dec., Ex. 2, Letter to SEC dated January 16, 2014, at 11). Pipoly responded that there was no effect on the balance sheet because AmTrust had been accounting for ceding commission correctly on the balance sheet – treating it as a reduction of policy acquisition costs. *Id*. Yet, AmTrust was treating ceding commission differently on its income statement, misclassifying it as revenue, which had the effect of inflating underwriting by 31% in 2011 and 14% in 2012. ¶190. The only reason for Pipoly to account for ceding commission differently on the income statement was to inflate underwriting income. Similarly, Pipoly was incorrectly accounting for the amortization of

---

[12] Defendants' reliance on *Dobina v. Weatherford International Ltd*, 909 F. Supp. 2d 228 (S.D.N.Y. 2012) is misplaced. In *Dobina*, the complaint never alleged that the reports to which management had access actually "contained sufficient information to demonstrate that the tax expenses were in error." *Id*. at 249. Here, by contrast, it is uncontested that defendants reviewed AmTrust's subsidiaries' reports and that the reports contained the subsidiaries' individual L/LAE. Simple addition of a few numbers, which was required for purposes of consolidation, provided defendants with knowledge of the staggering $290 million discrepancy.

deferred tax liability from the Luxembourg equalization reserves as a reduction of acquisition costs and other underwriting expense, rather than a reduction of income tax expense – as the SEC required. (Tully Dec. Ex. 13, Letter to SEC dated December 4, 2013, at 10; Ex. 10, Letter to SEC dated April 8, 2014, at 1, Rosen Dec. Ex. 2, Letter to SEC dated January 16, 2014, at 11-13). This error had the effect of making AmTrust's insurance operations look more profitable, rather than showing the truth, that AmTrust was skilled at exploiting tax loopholes.

This isn't the first time Pipoly committed fraud at an insurance company. Pipoly was the controller and an executive officer of a property casualty insurer liquidated by Ohio regulators in 2001 after his boss was jailed for stealing $30.0 million through offshore entities.[13] ¶44. The Delaware Bankruptcy Court determined that Pipoly had knowledge of the fraud and did nothing to investigate or prevent it. ¶45. The Bankruptcy Court also found that Pipoly testified incredibly and contrary to the evidence in an effort to prevent appointment of a trustee to protect the insurer. ¶45. Nor is AmTrust's the first public company's financial statements that he has overseen that have been found to have violated GAAP. Pipoly served as CFO of AmTrust affiliate Maiden Holdings, which its auditor determined had "a material weakness in [its] internal control over financial reporting" and that Pipoly had failed "to give appropriate consideration to U.S. GAAP accounting rules or to have documentation of the basis for [the company's] opinion and conclusion regarding the application of U.S. GAAP"(¶46) Pipoly isn't a neophyte in manipulating financial statements of an insurance company.

Finally, AmTrust had substantial motive to conceal its true losses in order to obtain more than $600 million from a series of debt and equity offerings during the Class Period at lower costs. ¶¶176-185. *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) (*quoting Novak*, 216 F.3d at 307) (motive to inflate stock price to maximize revenue from secondary offering supports scienter inference); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 444-45 (S.D.N.Y. 2000) (company's motive to inflate the price of its

---

[13]  Another former executive officer of that same liquidated insurer, Michael Saxon, serves as COO of AmTrust. ¶44

stock issued in IPO sufficient for scienter); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 269-70 (2d Cir. 1993) (motive to artificially inflate price of rights offering sufficient for scienter); Courts "have held that a demonstration of a desire to raise company financing, combined with the 'red flags' of a company's financial condition, are sufficient to plead scienter." *Nguyen v. Radient Pharmaceuticals Corp.*, 946 F.Supp.2d 1025, 1040 (C.D.Cal. 2013) (*Citing Howard v. Everex Systems, Inc.*, 228 F.3d 1057 (9th Cir. 2000).[14]

## IV.  IV. THE COMPLAINT PLEADS LOSS CAUSATION

"A complaint need only provide the defendant with 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *Dura Pharmaceuticals, Inc., v. Broudo*  544 U.S. 336, at 347 (2005). On December 12, 2013, AmTrust's share price dropped $4.63 per share or 12%, upon publication of the Geoinvesting Report, which first brought to light that AmTrust was concealing losses through accounting machinations and concluded that its true losses were $290 million greater and its true underwriting income at least $290 million lower from 2010 through 2012. ¶¶25-3232, 92-105. The requisite "causal connection" may be established where, as here, the market reacted negatively to accusations of fraud in a short-seller's report.[15]*In re Winstar Commun.,*  2006 WL 473885, *14 (S.D.N.Y. 2006) (explaining that Dura "did not set forth any requirements as to who may serve as the source of the information . . . ," and concluding that loss causation established where "short-term seller's reports" criticized the issuer's financial condition); *In re Longwei Petroleum,* 2014 WL 285103, at *4 (on motion to dismiss, loss causation satisfied by short seller's report because "[d]efendants imply that GeoInvesting's revelations were in fact untrue, but such a claim cannot be evaluated on a motion

---

[14]  Contrary cases cited by defendants are not apposite as (a) the only allegations of scienter in those cases were those related to raising capital, whereas here, the stock and debt offerings are additional corroborative evidence of motive and opportunity which under *Tellabs* may be considered holistically with the other strong allegations of conscious misconduct; and (b) the *Time Warner* case cited by plaintiffs is a controlling Second Circuit decision.

[15]*In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006) ("*Dura* imposed no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion.")

to dismiss."). Defendants do not attribute this share price decline to any specific or general market event other than the Geoinvesting reports.

Defendants attack loss causation on the basis that the Geoinvesting reports were merely "[a] negative journalistic characterization of previously disclosed facts [that] does not constitute a corrective disclosure of anything but the journalists' opinions." MTD at 23, *citing In re Omnicom Group, Inc. Sec. Litig.,*597 F.3d 501, 512 (2d Cir. 2010). But, the Complaint pleads that critical pieces of information necessary to complete Geoinvesting's analyses were not publicly available. ¶192-¶200. The key document was AII's (AmTrust's Bermuda subsidiary) financial statements filed with Bermuda regulators. ¶¶193-196 AII's financial statements were not publicly available to investors.[16] ¶¶195-196. And AmTrust's UK and Luxembourg subsidiaries filed their Statutory Reports in Europe. Ordinary investors had no knowledge of how to access those reports. ¶¶193-94.

In *Omnicom*, which was decided on *summary judgment*, the Wall Street Journal had merely *repeated* the identical facts previously disclosed by analysts and journalists a year earlier. *Omnicom* 597 F.3d at 505, 512 (holding also that "none of these matters even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint"). *Keryx Biopharmaceuticals*, is similarly irrelevant as there the *identical information* in the Street.com report that caused the stock price to drop had been released publicly by the issuer just weeks earlier. *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, No. 13 CIV. 1307 KBF, 2014 WL 585658, at *14 (S.D.N.Y. Feb. 14, 2014). Here, on the contrary, none of AmTrust's individual subsidiaries' financial statements were ever referenced in the mass media or publicly in any fashion. Nor did any journalist or analyst ever previously suggest that AmTrust had been concealing or misclassifying L/LAE. The Geoinvesting Report was the very

---

[16]Geoinvesting obtained AII's Bermuda financial statements from the court record in an unpublicized lawsuit. ¶¶196-197. Moreover, the fiscal 2012 statutory financial statements Geoinvesting's analyses relied on (from TIC) were not even filed with insurance regulators until April 29, 2013. ¶198

first public suggestion that AmTrust's L/LAE, loss ratios or underwriting income were misrepresented.

Lastly, in their Statement of Facts, Defendants suggest that, because AmTrust's share price later rebounded, Plaintiffs do not state a claim. MTD at 5. The Second Circuit flatly rejected that notion in *Acticon AG v. China North East Petrol. Holdings Ltd*., 692 F.3d 34 (2d Cir. 2012). Subsequent share price rises do not quash a claim under Section 10(b). An investor who decides to hold on to his stock after fraud is disclosed thereby makes a "second investment decision," and cannot lose her cause of action for having been defrauded in making her first decision on grounds that the second decision yields a profit.

## V. THE COMPLAINT ADEQUATELY PLEADS A SECTION 11 CLAIM

Defendants' only mention of Plaintiffs' Section 11 claim in their motion to dismiss is to assert that Section 10(b) and Section 11 "share a material misstatement or omission element" and therefore the heightened pleading standards of the PSLRA apply to the Section 11 claim. MTD at 11. As a practical matter this only means that plaintiffs must allege the false statements with particularity. This is satisfied by describing reasons why the statement is false and the sources upon which the allegations of falsity are based. *Fuwei Films,* 634 F.Supp.2d at 437 (Interpreting Rule 9(b)'s requirements in light of *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir. 2004)). The Complaint describes the precise statutory financial statements proving that AmTrust understated its L/LAE, and loss ratios and overstated its underwriting income, and the amounts of the under/overstatements. ¶¶116-118

Issuers are subject to "virtually absolute" liability under section 11, while the remaining potential defendants may assert an affirmative defense that they were not negligent. *In re Morgan Stanley Information Fund Secur.Litig.,* 592 F.3d 347, 359-60, fn7 (2d Cir. 2010) And unlike claims under Section 10(b), "plaintiffs bringing claims under sections 11 … need not allege scienter, reliance, or loss causation. *Citing Rombach*, 355 F.3d at 169 n. 4. A finding that AmTrust understated L/LAE means that Plaintiffs have sufficiently alleged a Section 11 claim.

## CONCLUSION

For the reasons stated above, the Court should deny Defendants' motion to dismiss in its entirety.

Dated: December 10, 2014

Respectfully submitted,

THE ROSEN LAW FIRM P.A.

/s/ Laurence Rosen
_____
Laurence Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com
sfuks@rosenlegal.com

**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
Michael J. Wernke
Michelle Carino
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
migross@pomlaw.com
jalieberman@pomlaw.com
mjwernke@pomlaw.com
mcarino@pomlaw.com

Co-Lead Counsel for Plaintiffs and the Class