UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/29/2015
```

-------------------------------------------------------------- X
                                       :

MICHAEL D. HARRIS, individually and on behalf  :
of others similarly situated,                            :
                                         :                   14-CV-736 (VEC)
                         Plaintiffs,   :
                                           :           OPINION & ORDER
              -against-                   :

AMTRUST FINANCIAL SERVICES, INC.,      :
BARRY D. ZYSKIND and                   :
RONALD E. PIPOLY, JR.,                  :
                                           :
                         Defendants.  :
                                           :
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

Relying almost entirely on a negative report published by a short seller[1] that Lead Plaintiff[2]

concedes may have been wrong in certain respects and has been proven wrong in others by the

passage of time, this securities class action alleges violations of §§ 10(b) and 20(a) of the Securities

Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and violations of § 11 of the Securities Act of

1933, 15 U.S.C. § 77k.  The Second Amended Consolidated Class Action Complaint ("Amended

Complaint") is long on sound, fury and speculation, but it is short on specifics.  Although the

gravamen of the allegations is that Defendant AmTrust Financial Services, Inc. ("AmTrust") used

---

[1]      A "short seller" "speculates that a particular stock will go down in price and seeks to profit from that drop." *Levitin v. Paine Webber, Inc.*, 159 F.3d 698, 700 (2d Cir. 1998).

[2]      Co-Lead Plaintiff Michael D. Harris commenced this action on February 4, 2014, on behalf of all purchasers of common and preferred stock in AmTrust between February 15, 2011, and December 11, 2013, who did not sell their stock before December 12, 2013 (the "Section 10(b) Class").  Am. Compl. ¶ 1.  On April 24, 2014, the Court appointed Harris Co-Lead Plaintiff with Stuart Shapiro, who represents the § 11 sub-class of plaintiffs who purchased Series A preferred stock traceable to a public offering that occurred on June 10, 2013 (the "Section 11 Class"), pursuant to Section 21D(a)(3)(B)(iii) of the PSLRA.  Dkt. 20.  This opinion refers to Harris and Schapiro jointly as "Lead Plaintiff."

fraudulent accounting practices to manipulate its reported insured losses for the years 2010 through 2012, the Amended Complaint fails to allege that AmTrust violated a single Generally Accepted Accounting Principle ("GAAP"). Because the Amended Complaint falls short of plausibly alleging a misstatement or omission as required for all claims and does not adequately allege scienter as required for §§ 10(b) and 20(a) claims pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, the Amended Complaint is DISMISSED.[3]

## I. Facts[4]

AmTrust is an insurance company that underwrites and reinsures property and casualty insurance, workers' compensation insurance, special risk insurance, and warranty insurance through a network of domestic and foreign subsidiaries, including subsidiaries in Bermuda and Luxembourg. Am. Compl. ¶¶ 3, 56-59. Lead Plaintiff alleges that AmTrust's Consolidated Financial Statements for fiscal years 2010 through 2012 fraudulently underreported losses associated with insurance policies, the premiums for which had been ceded to reinsurance

---

[3]     This is Plaintiffs' third pleading. The first complaint was filed on February 4, 2014. Plaintiffs filed an Amended Consolidated Class Action Complaint on July 7, 2014, after the Court certified two investor classes and appointed co-lead plaintiffs. Defendants moved to dismiss that complaint on August 11, 2014. Rather than responding to the motion to dismiss, Plaintiffs filed a Second Amended Consolidated Class Action Complaint on September 4, 2014.

        The Court notes that Plaintiffs would do well to familiarize themselves with the adage that "less is more." The Amended Complaint spans 61 pages and has 243 paragraphs. Many of those paragraphs were either irrelevant or merely recycled allegations from earlier paragraphs. Moreover, in responding to Defendants' Motion to Dismiss, Plaintiffs violated Local Civil Rule 11.1((b)(3), which requires memoranda of law to be double spaced, by manipulating the line spacing to fit 27 lines of text per page rather than the standard 23 lines per page. Not satisfied with what amounts to 4 additional pages of briefing (4 lines per page in a 25-page memorandum), Plaintiffs filed a letter on February 3, 2015, intending to serve as a sur-reply. Dkt. 53. The Court denied the request to file a sur-reply and does not consider Plaintiffs' arguments contained therein. Dkt. 55.

[4]     The facts are construed in the light most favorable to the plaintiffs and are drawn from the allegations of the Amended Complaint, documents attached as exhibits thereto, statements or documents that are incorporated into the Amended Complaint by reference, and judicially-noticed information, such as public disclosure documents filed with the SEC. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

subsidiaries located in Luxembourg.[5]  *Id.* ¶¶ 3-5, 48.   The Amended Complaint alleges that defendant Barry D. Zyskind, AmTrust's Chief Executive Officer and President and a director of the company during the relevant time period, and defendant Ronald E. Pipoly, AmTrust's Chief Financial Officer during the relevant time period (collectively, "Individual Defendants"), are liable under § 20(a) of the Exchange Act and § 11 of the Securities Act as controlling officers of AmTrust and as persons who signed the pertinent SEC filings.  *Id.* ¶¶ 43, 44.

AmTrust's domestic insurance subsidiaries underwrite the majority of AmTrust's insurance policies and cede at least 70% of their written premiums and associated losses to a reinsurance subsidiary located in Bermuda. *Id.* ¶¶ 56-57.  In 2009, AmTrust acquired a reinsurance subsidiary located in Luxembourg, which, in turn, acquired nine other Luxembourg reinsurance subsidiaries over the following four years. *Id.* ¶¶ 59-60.  Pursuant to a stop-loss agreement between the Bermuda and Luxembourg subsidiaries, the Bermuda subsidiary ceded at least $245 million of reinsured losses and associated premiums to the Luxembourg subsidiary between 2010 and 2012. *Id.* ¶¶ 60, 64-65.[6]

Luxembourg reinsurance companies are financed differently than U.S. reinsurers.   A reinsurance company formed under Luxembourg law is required to establish an "Equalization Reserve" to cover unforeseen catastrophes or major losses.  Rosen Decl. Ex. 2 ("Jan. 16 Letter") at 4-5; Am. Compl. ¶¶ 61-62.   Under Luxembourg generally accepted accounting principles

---

[5]      Reinsurance allows an insurer, or ceding company, to transfer all or part of the underlying risk of an insurance policy to a reinsurer, or assuming company, in order to manage risk exposure from underwritten policies and write more policies without a significant increase in capital and risk. Am. Compl. ¶ 51.  In a reinsurance contract, the reinsurer assumes all or part of the risk associated with reinsured policy in exchange for a portion of the premium associated with that risk.  *Id.* ¶ 52.  The original insurer pays claims on the policies it issues but can recover the reinsured amount of loss from the reinsurer.  *See* Tully Decl. Ex. 4 at 16.

[6]      The Bermuda subsidiary ceded $62.12 million in 2010, $96.06 million in 2011, and $86.91 million in 2012 to the Luxembourg subsidiary.  Am. Compl. ¶ 65.  It is not clear why the sum of the specific amounts ceded as alleged in Paragraph 65 of the Amended Complaint ($245.09 million) is not the same as the aggregate that was allegedly "hidden" according to Paragraph 27 ($289.9 million).

("Luxembourg GAAP"), the company can draw from its Equalization Reserve to offset or absorb excess losses while recognizing no taxable income and, in so doing, can deplete the Equalization Reserves over time.  *See* Jan. 16 Letter at 4-5; Am. Compl. ¶¶ 62, 130.  AmTrust's 2012 Annual Report disclosed that a subsidiary Luxembourg holding company:

> [O]wns all of the outstanding stock of seven[7]Luxembourg-domiciled captive insurance companies that had accumulated equalization reserves, which are catastrophe reserves in excess of required reserves that are determined by a formula based on the volatility of the business reinsured.  Because [the Bermuda subsidiary] is an insurance company with the ability to cede losses, the captives are well-positioned to utilize their equalization reserves.  Luxembourg does not impose any income, corporation, or profits tax on [the holding company] provided sufficient losses cause the equalization reserves to be exhausted.

Tully Decl. Ex. 4 ("2012 Annual Report") at 23.

Equalization Reserves are not a feature of U.S. reinsurance companies.  *See* Letter of Ronald E. Pipoly, Jr., AmTrust Financial Services, Inc., to Jim B. Rosenberg, U.S. Securities and Exchange Commission (Dec. 4, 2013) (via EDGAR) ("Dec. 4 Letter") at 4.[8]  United States GAAP does not address how AmTrust should account for the depletion of the Luxembourg Equalization Reserves in its consolidated financial statement.  Am. Compl. ¶¶ 62-63, 138.[9]  In a written

---

[7]    By the time the Amended Complaint had been filed, AmTrust had acquired additional Luxembourg subsidiaries, raising the total to nine.  Am. Compl. ¶ 59.

[8]    The Amended Complaint "incorporated by reference" the "written dialogue between the SEC and AmTrust" that commenced with the Comment Letter from the SEC, dated November 5, 2013, *Id.* ¶ 186, and selectively relies on excerpts from those correspondences, *see* Rosen Decl. Ex. 2 (AmTrust's January 4, 2014, letter to the SEC).  All letters were filed on EDGAR and are publicly available and are considered part of the pleadings for purposes of this motion.

[9]    The Amended Complaint alleges that GAAP prevents an insurer from using "equalization reserves to reduce losses" (but does not cite a recognized GAAP source for that proposition) and that the GAAP rule exists in order "to prevent management from manipulating earnings and to ensure that investors are provided an accurate view of the current profitability of the insurance operation."  Am. Compl. ¶ 63.  The Court is not required to accept Lead Plaintiff's legal or accounting conclusion regarding the GAAP requirements relative to equalization reserves inasmuch as it fails to cite in more than general terms that AmTrust "violated GAAP."  *See In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (dismissing securities class action claims as to violations of GAAP because the court found "no facts sufficient to identify any violations of GAAP – or any inference that [the defendant] was unreasonable in its judgments," and "the accounting rules governing the relevant practice are sufficiently flexible so as to encompass [the defendant's] interpretation of them").  "Financial accounting is not a science.  It addresses many questions as to which the answers are uncertain and is a 'process [that] involves continuous judgments and estimates.'"

exchange with the Corporate Finance Division of the SEC, AmTrust provided in depth explanations for how it recorded reductions to its Equalization Reserves.  *See id.*  In the absence of definitive guidance, AmTrust "establish[ed] a statutory liability equal to approximately 30% of the unutilized portion of the equalization reserves" so that it could reflect changes to the equalization reserves on its consolidated financial statement.  *See* Dec. 4 Letter at 4. It then "adjust[ed] the statutory liability each period based on premiums and losses ceded to the Luxembourg reinsurers," and recorded the "reduction of the statutory liability related to the utilization of the equalization reserves . . . as a reduction to general administrative expenses." *Id.*[10] Although the SEC suggested that AmTrust modify its accounting treatment to record Equalization Reserves as a deferred tax liability (rather than as a statutory liability) and to expand its disclosures about the Luxembourg reinsurance subsidiaries, *see* Jan. 16 Letter at 4-5, the SEC did not require a restatement.  Without addressing the specifics of AmTrust's accounting practices, the Amended Complaint alleges that AmTrust "misclassified" $289.9 million of losses that had been ceded to the Luxembourg subsidiaries between 2010 and 2012 as "other non-underwriting expense items"

---

*Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 100 (1995) (citation omitted); *accord Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim," and must be "coupled with evidence of 'corresponding fraudulent intent'"); *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) ("[I]t is well settled that a mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter."). A plaintiff alleging a GAAP violation when a restatement did not occur (as here) faces a high hurdle to allege a GAAP violation (as opposed to mere error in judgment), because

> GAAP is not the lucid or encyclopedic set of pre-existing rules that [it might be perceived] to be. Far from a single-source accounting rulebook, GAAP encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.  GAAP changes and, even at any one point, is often indeterminate.  The determination that a particular accounting principle is generally accepted may be difficult because no single source exists for all principles.

*In re Worldcom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 478 (S.D.N.Y. 2005) (quoting *Guernsey Mem. Hosp.*, 514 U.S. at 100 (alteration in *In re Worldcom*)).

[10]    According to AmTrust's 2012 Annual Report, "[g]eneral and administrative expenses are comprised of other costs associated with our insurance activities, such as federal excise tax, postage, telephones and internet access charges, as well as legal and auditing fees and board and bureau charges."  2012 Annual Report at 64.

rather than "loss and loss adjustment expenses" in its consolidated financial statements.  Am. Compl. ¶¶ 4, 24, 27.[11]

The impetus for this securities fraud class action was a report published by GeoInvesting, a short seller that had obtained reports that AmTrust's subsidiaries filed with insurance regulators in the United States and Bermuda between 2010 and 2012 (the "GeoInvesting Report").  *Id.* ¶ 25. The GeoInvesting Report, published on December 12, 2013, compared losses reported in AmTrust's consolidated financial statements, which are compiled using GAAP, to the aggregate losses of AmTrust's domestic subsidiaries reported to insurance regulators, which are compiled using statutory accounting principles ("SAP").  *Id.* ¶¶ 26, 106-07, 138.[12]  When the numbers did not match, the GeoInvesting Report labeled AmTrust a "house of cards" that "fraudulently" made $289.9 million in losses "disappear" in its consolidated financial statement by not "recognizing . . . the losses ceded to its Luxembourg subsidiaries."  *Id.* ¶ 26.  AmTrust's Annual Reports had, however, disclosed that financial statements prepared using SAP and GAAP produce different numbers because SAP's primary concern is "monitoring and regulating the solvency of insurance companies," whereas GAAP "gives more consideration to appropriately matching revenue and

---

[11]     An insurance company reports its "losses resulting from current payments and estimated payments resulting from insurance claims" on a line item called "loss and loss adjustment expense," which is the largest expense item on its financial statement. Am. Compl. ¶ 9. The loss and loss adjustment expense rolls into other industry-specific ratios reported on the financial statement that are allegedly used by investors.  *Id.* ¶¶ 7-14.

[12]     The Amended Complaint claims that "prior to obtaining" the Bermuda subsidiary's non-public "audited financial statements it was impossible . . . to put all the pieces of the puzzle together and discover AmTrust's fraud." *Id.* ¶¶ 195-97.  The key element of the so-called fraud, however, was the publicly-reported losses of AmTrust's domestic subsidiaries that write the insurance policies, not the reported losses of its subsidiary in Bermuda that reinsures those policies.  The only relevance of the non-public information about the Bermuda subsidiary to the GeoInvesting Report was its theory, which Lead Plaintiff now concedes "may have been mistaken," that "AmTrust was making the[] losses 'disappear' by ceding them to its Luxembourg subsidiaries" that "us[ed] [their] equalization reserves to absorb the losses (and make them disappear)."  *See id.* ¶¶ 130-33, 135.

expenses and accounting for management's stewardship of assets than does SAP." *See* Tully Decl. Ex. 4 ("2012 Annual Report") at 29.[13]

The market reacted as GeoInvesting no-doubt hoped to the allegations that AmTrust had falsified its financial reports and was a "house of cards": on December 13, 2012, AmTrust's common stock price dropped 12%, closing at $33.64. Am. Compl. ¶ 32.[14] On December 16, 2013, GeoInvesting published a second report to respond to criticisms and held firm to its allegations that AmTrust was ceding losses without ceding premiums. *Id.* ¶¶ 97-98. On December 16, 2013, AmTrust held an investor conference call to reassure investors and to refute GeoInvesting's allegations, but the share price continued to decline, closing at $28.62 on December 18, 2013. *Id.* ¶¶ 100-01. Despite GeoInvesting's apocalyptic prediction of AmTrust's imminent collapse, as of September 21, 2015, AmTrust was still in business, and its shares closed that day at $61.70.

Although the Amended Complaint, like the GeoInvesting Report, alleges wrongdoing solely because there was a difference between the reported losses,[15] its theory of wrongdoing

---

[13]     In full, the 2012 Annual Report stated that:

> Statutory Accounting Principles, or SAP, are a basis of accounting developed to assist insurance regulators in monitoring and regulating the solvency of insurance companies. SAP is primarily concerned with measuring an insurer's solvency. Statutory accounting focuses on valuing assets and liabilities of insurers at financial reporting dates in appropriate insurance law and regulatory provisions applicable in each insurer's domiciliary state.

> GAAP is concerned with a company's solvency, but is also concerned with other financial measurements, principally income and cash flows. Accordingly, GAAP gives more consideration to appropriately matching revenue and expenses and accounting for management's stewardship of assets than does SAP. As a direct result, different assets and liabilities and different amounts of assets and liabilities will be reflected in financial statements prepared in accordance with GAAP as compared to SAP.

2012 Annual Report at 29.

[14]     The proposed classes were defined to include shareholders who owned shares of AmTrust on December 11, 2013, the day before GeoInvesting released its "findings" to the public. *See* Am. Compl. ¶ 1.

[15]     According to the Amended Complaint, SAP and GAAP use the same equation to calculate loss and loss adjustment expense and, therefore, should yield the same result. *Id.* ¶ 124. The problem with that theory is that there is no allegation that SAP and GAAP yield the same *inputs* to the equation.

diverges from the GeoInvesting Report.  Lead Plaintiff alleges that, "rather than relying on the Luxembourg equalization balances to fraudulently erase the $289.9 million in losses," as the GeoInvesting Report claimed, "in the process of consolidating its financial statements, AmTrust 'eliminated' the balance of the $289.9 million in loss and loss adjustment expense by misclassifying them as other non-underwriting expense items on its consolidated income statement." *Id.* ¶ 27.  AmTrust "never specified how it accounts for the[] losses" following the GeoInvesting Report "or whether the[] losses are reclassified as other types of expense through the use of eliminating entries in the consolidation process." *Id.* ¶ 66.[16]  Lead Plaintiff speculates, however, that when AmTrust eliminated intra-entity transactions between the subsidiaries in Bermuda and Luxembourg (which GAAP required it to do), it "improperly reclassif[ied] or misclassif[ied] loss and loss adjustment expenses for the Luxembourg subsidiaries" and caused them "to appear on other, unrelated[] lines" in the consolidated financial statement, thereby "convert[ing] underwriting losses into non-underwriting losses." *Id.* ¶¶ 66, 138, 143.[17]

The Amended Complaint does not allege that AmTrust inaccurately reported its total expenses, but instead it alleges that AmTrust manipulated its reported losses and loss ratios when it eliminated intra-company transactions by eliminating loss and loss adjustment expense entries and reporting only other underwriting expense entries, while leaving premium revenue entries intact.  *Id.* ¶ 142.  The alleged misclassification resulted in underreporting underwriting loss

---

[16]     When a parent company consolidates its subsidiaries' financial statements, it eliminates intra-entity balances and transactions.  *Id.* ¶ 137.  So, for example, if Subsidiary A transacts with Subsidiary B, neither company reports an expense or revenue in its parent's consolidated financial statement.

[17]     The Amended Complaint alleges that AmTrust "admit[ted] that losses of approximately $289.9 million had been 'eliminated' in consolidation and not through other means of accounting" in its memorandum of law in support of its prior motion to dismiss when it asserted that AmTrust "has not 'hidden' any losses, but rather has properly eliminated a transaction between subsidiaries . . . as part of the consolidation process under GAAP." *Id.* ¶¶ 138, 143. The Court must accept as true Lead Plaintiff's allegation that AmTrust purported to explain that the different loss amounts came about because of the use of elimination entries -- because it is a factual allegation -- but the Court is not required to accept Lead Plaintiff's spin that AmTrust "admitted" to "eliminating" losses.

expense by $70.97 million in 2010, $102.3 million in 2011, and $116.7 million in 2012. *Id.* ¶¶ 72, 78, 84. This, in turn, allegedly skewed AmTrust's loss ratio, a "key financial performance metric[]" that investors use to gauge an insurance company's underwriting strategy and financial health, by 9.5% in 2010, 9.9% in 2011, and 8.2% in 2012. *Id.* ¶¶ 14, 73, 79, 85.[18] For these three years, AmTrust's loss ratio was allegedly 9.3 to 14.1 percent lower than the industry average, indicating above-average performance. *Id.* ¶ 152.

The Amended Complaint alleges that the expenses were misclassified because "properly" recorded elimination entries would not "cause one type of an expense to appear as another on a consolidated entity's financial statements" or "cause losses transferred from one subsidiary to another to simply disappear." *Id.* ¶ 139; *see also id.* ¶ 136 (citing Financial Accounting Standards Board Accounting Standards Codification ("ASC") § 810-10-10-1, for the proposition that the purpose of consolidating financial statements is to "make them more meaningful than separate financial statements and . . . are usually necessary for a fair presentation when one of the entities in the consolidated group . . . has a controlling financial interest in the other entities").[19] ASC 810-10-45-1 provides that when financial statements are consolidated, "intra-entity balances and transactions shall be eliminated. . . . As consolidated financial statements are based on the assumption that they represent the financial position and operating results of a single economic entity, such statements shall not include gain or loss on transactions among the entities in the consolidated group." Am. Compl. ¶ 137. AmTrust's Annual Reports included the disclosure that:

> The consolidated financial statements of the Company have been prepared in
> conformity with the accounting principles generally accepted in the United States

---

[18] The "loss ratio" is calculated by dividing the company's "loss and loss adjustment expense" by its "net earned premium." *Id.* ¶ 11.

[19] The Amended Complaint also cites ASC § 810-10-15-10, which provides that the financial statements of majority-owned subsidiaries "shall be consolidated," and ASC § 810-10-15-8, to define the "usual condition[s] for a controlling financial interest" that triggers consolidation. *Id.* ¶ 137. The Amended Complaint does not allege that either of these provisions was violated.

of America.  The consolidated financial statements include the accounts of the Company and its domestic and foreign subsidiaries . . . .  All significant transactions and account balances between the Company and its subsidiaries were eliminated during consolidation.

*Id.* ¶ 138; *see* 2012 Annual Report.  The Amended Complaint alleges that AmTrust violated GAAP when it eliminated transactions because eliminating entries "should . . . have a zero net effect" on AmTrust's reported premiums and loss and loss adjustment expense and, in any event, "would have been unnecessary."  Am. Compl. ¶¶ 140-41.  The Amended Complaint alleges that the elimination of transactions did have a "net effect" on AmTrust's consolidated loss and loss adjustment expense because it did not match the aggregate of the subsidiaries' losses.  *See id.* ¶ 142.  The Amended Complaint does not provide any factual or legal support for its conclusions that AmTrust's elimination entries or reported losses were, in fact, improper.[20]

The Amended Complaint also alleges that Regulation S-X, Rule 7-04, requires that insurance companies' financial statements include line items reflecting, *inter alia*, "benefits, claims, losses and settlement expenses," *id.* ¶ 145,[21] and that financial statements that do not provide required information are "presumed to be misleading," *id.* ¶ 146.[22]  From that, the

---

[20]     As explained *supra*, the Amended Complaint did not tie these allegations to AmTrust's methodologies for reporting changes in the Luxembourg subsidiaries' Equalization Reserves.

[21]     The "purpose" of Regulation S-X Rule 7-04, 17 C.F.R. § 210.7-04, "is to indicate the various items which, if applicable, should appear on the face of the income statements and in the notes thereto filed for" insurance companies.  As "Premiums," insurance companies should "[i]nclude premiums from reinsurance assumed and deduct premiums on reinsurance ceded.  Where applicable, the amounts included in this caption should represent the premiums earned."  17 C.F.R. § 210.7-04(1).  "Benefits, claims, losses and settlement expenses" should also appear on the face of the income statement, but Rule 7-04 does not provide additional detail as to what should be reported.  17 C.F.R. § 210.7-04(5).  The Amended Complaint does not allege that any of these line items were missing.

[22]     Regulation S-X Rule 4-01(a) is a generally applicable rule that states:

(a) Financial statements should be filed in such form and order, and should use such generally accepted terminology, as will best indicate their significance and character in light of the provisions applicable thereto.  The information required with respect to any statement shall be furnished as a minimum requirement to which shall be added such further material information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

Amended Complaint alleges that AmTrust's financial statements were misleading because they did "not properly classify[] and record[]" the $289.9 million in losses.  *Id.* ¶ 147.

The Amended Complaint also takes issue with the assumptions that went in to AmTrust's financial statements.  *See id.* ¶ 5 ("AmTrust accomplished this fraud by making knowingly unrealistic actuarial assumptions as to the amount of expected future losses from insurance policies it wrote."); *see also id.* ¶¶ 15-16, 20, 163-69.  The Amended Complaint claims that a "unique aspect" of preparing an insurance company's financial reports is that "management is able to manipulate underwriting income by making unrealistically low estimates of the future costs of resolving claims."  *Id.* ¶¶ 15-16.  The Amended Complaint alleges that AmTrust makes "unreasonably generous actuarial assumptions" about "incurred but not reported" ("IBNR") losses (a component of total recorded loss and loss adjustment expense) because it uses "unrealistically low loss ratio assumptions."  *Id.* ¶¶ 162-63, 165, 167.  According to the Amended Complaint, AmTrust misclassified the ceded losses to "avoid[] discovery" when its "knowingly unrealistic actuarial assumptions" inevitably "come home to roost."  *Id.* ¶¶ 5, 17-21, 165.

In further support of its allegations that AmTrust's financial reports were fraudulent, the Amended Complaint alleges that an inference of fraud can be drawn from AmTrust's results, which it alleges were simply "too good to be true."  *Id.* ¶ 157; *see also id.* ¶¶ 148-75.  According to the Amended Complaint, AmTrust "has grown exponentially while reporting loss and expense ratios that are vastly superior to its competitors."  *Id.* ¶ 149.  The Amended Complaint alleges that the premium growth AmTrust reported defies credulity given its high-volume, low-price underwriting strategy because premiums for the rest of the market were "shrinking."  *Id.* at ¶¶ 21,

---

(1) Financial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the [SEC] has otherwise provided. . . .

17 C.F.R. § 210.4-01(a).

170-72; *see also id.* ¶ 172 ("It is implausible to grow exponentially in a shrinking market without underpricing the competition . . . to gain market share . . .. AmTrust's lower revenue per assumed risk cannot result in such consistently lower net loss ratio, particularly given its 400% growth in a shrinking market" for workers' compensation insurance).

According to the Amended Complaint, AmTrust had motive to commit fraud in order to conceal its allegedly "increasing losses" and fund its underwriting strategy in the wake of "unrealistically low" future cost estimates, which required "access to more and more capital." *Id.* ¶¶ 21-24. Demonstrative of the alleged need for more capital to finance its operations, AmTrust obtained over $600 million of equity and debt financing in the forms of stock, note, and loans, and lines of credit during the class period. *Id.* ¶¶ 175-85. Allegedly, AmTrust's "bank borrowings and lines of credit required it to maintain financial metrics that would have been violated had the losses not been concealed." *Id.* ¶ 177.

Lead Plaintiff alleges that the "misclassification" of ceded losses violated unspecified GAAP, materially understated AmTrust's consolidated loss and loss adjustment expenses, overstated AmTrust's consolidated underwriting income,[23] and, overall, misled investors about the profitability of AmTrust's insurance business. *Id.* ¶¶ 4, 24, 27, 31, 66, 136-38. The Amended Complaint also alleges that on June 5, 2013, AmTrust sold 4 to 6 million shares of preferred stock based on a registration statement and prospectus that were materially false and misleading because they incorporated the misleading financial statements that were contained in AmTrust's 2012 Annual Report. *Id.* ¶¶ 86-91.

---

[23]      Underwriting income is net earned premiums minus loss and loss adjustment expense and acquisition costs and other underwriting expenses. Am. Compl. ¶ 7. Net earned premium is earned premiums minus premiums that are ceded to third party reinsurers under reinsurance agreements. *Id.* ¶ 8.

**Individual Defendants**

The Amended Complaint alleges that the Individual Defendants are liable because they signed the Annual Reports knowing that the losses were understated and made statements to investors "touting" AmTrust's low loss ratios. *Id.* ¶¶ 71, 77, 83, 128-29; *see Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) ("Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act." (citing 15 U.S.C. § 78t(a))).[24]

The Amended Complaint alleges that, as CEO and CFO of AmTrust, the Individual Defendants "knew of contemporaneous facts, and had access to and reviewed, the financial reports filed with . . . insurance regulators showing that AmTrust's loss and loss adjustment expense was greater" than AmTrust reported in its consolidated financial statements. *Id.* ¶ 127. It also alleges that Zyskind and Pipoly knew "that AmTrust was not reporting all of the loss and loss adjustment expense that it was incurring" because they "would have reviewed and approved the statutory financial statements of each of AmTrust's subsidiaries prior to their being filed with regulators each year," and that Pipoly "received quarterly and annual internal reports detailing each subsidiary's loss and loss adjustment expense." *Id.* ¶¶ 128-29. Despite their alleged knowledge of the falsity of AmTrust's consolidated reports, the Individual Defendants signed AmTrust's consolidated 2010, 2011, and 2012 annual reports affirming that the reports fairly present, in all material respects, the financial condition and results of operations of AmTrust. *Id.* ¶¶ 70-71, 76-

---

[24]     The Amended Complaint alleges in general terms that Zyskind and Pipoly "discussed the amount of loss and loss adjustment expense that AmTrust incurred in 2010, as well as its loss ratio and combined ratio," and that they "made in depth statements about the reasons for AmTrust's losses, and loss ratios and the trends it was experiencing for these key metrics" in an investor conference call about AmTrust's financial results on February 15, 2011, but it did not identify any specific false statement made by either defendant. *Id.* ¶ 69. Similarly broad allegations were made regarding statements on conference calls on February 15, 2012, and February 14, 2013. *Id.* ¶¶ 75, 81.

77, 82-83.  In addition, AmTrust held investor conference calls, during which Zyskind and Pipoly allegedly "touted" AmTrust's financial performance, "discussed" AmTrust's losses and loss ratios, and "made in depth statements" about AmTrust's loss ratios and "trends" about these "key metrics."  *Id.* ¶¶ 69, 75, 81.[25]

The Amended Complaint alleges that the Individual Defendants are liable under § 10(b) of the Exchange Act because, "by virtue of their positions," they knew (or acted with reckless disregard) that statements of material fact contained in the annual reports were untrue, or omitted material facts necessary in order to make the statements that were made not misleading, in violation of their duty to disseminate timely, accurate, and truthful information.  *Id.* ¶¶ 215-18.  It alleges that the Individual Defendants are liable under § 20(a) of the Exchange Act because they are "controlling persons" of AmTrust within the meaning of § 20(a) and controlled the allegedly misleading reports disseminated in the marketplace concerning the results of AmTrust's operations.  *Id.* ¶¶ 223-30.  Finally, it alleges that they are liable under § 11 of the Securities Act because the prospectus and registration statement for the June 10, 2013, public offering that they signed contained untrue statements of fact or omitted material facts, but as to this claim, the Amended Complaint does not allege that the Individual Defendants acted with fraudulent intent. *Id.* ¶¶ 232-37.

## II.  Discussion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court

---

[25]     Although the Amended Complaint attaches transcripts of investor calls held on February 15, 2011, February 15, 2012, and February 14, 2013, it does not allege that any specific statement made during the calls was untrue or misleading.  *See id.* ¶¶ 69, 75, 81; *id.* exs. L, N, P.

may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The plaintiff must plead sufficient factual matter "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although the Court "must accept as true all of the [factual] allegations contained in the complaint," the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

> To maintain a private securities class action under § 10(b) of the Exchange Act:

> a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Securities fraud claims under § 10(b) of the Exchange Act and Rule 10b–5 must satisfy two layers of heightened pleading requirements: first, a complaint alleging securities fraud must satisfy Rule 9(b) of the Federal Rules of Civil Procedure, and, second, private securities fraud class actions must satisfy the pleading requirements set forth in PLSRA, 15 U.S.C. § 78u-4(b)(1).  *See ATSI Commc'ns*, 493 F.3d at 99.  "The PSLRA builds on Rule 9's particularity requirement, dictating the pleading standard for claims brought under the Exchange Act."  *Blanford*, 794 F.3d at 304.  "PSLRA specifically requires a complaint to demonstrate that the defendant made '[m]isleading statements [or] omissions . . . of a material fact,' 15 U.S.C. § 78u-4(b)(1), and acted with the '[r]equired state of mind' (the 'scienter requirement'), *id.* § 78u-4(b)(2)."  *Id.* at *7.

"To state a claim under section 11 [of the Securities Act], the plaintiff must allege that (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11," *e.g.*, was an issuer, underwriter, or signed the registration statement, or was a director or partner of the issuer; and "(3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).

Although § 10(b) and § 11 claims "share a material misstatement or omission element," *City of Omaha, Nebraska Civilian Employees' Retirement System v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012), "[p]laintiffs need not allege scienter, reliance, or causation," to state a claim under § 11 of the Securities Act, *City of Pontiac Policemen's & Fireman's Retirement System v. UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014).   Section 11 imposes on issuers "'virtually absolute' liability," while "the remaining potential defendants . . . may be held liable for mere negligence." *In re Morgan Stanley*, 592 F.3d at 359 (citing *Pinter v. Dahl*, 486 U.S. 622, 646 (1988); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 & n.12 (1983)).

In this case, the Amended Complaint declares that its § 11 claim "does not sound in fraud. Any proceeding [sic] allegations that might imply fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  In this Count, Plaintiffs do not allege that Defendants had scienter or fraudulent intent, which are not elements of this claim."  Am. Compl. ¶¶ 232.  As an initial matter, forcing the Defendants (and the Court) to discern which statements in the 61-page, 243-paragraph Amended Complaint "imply fraud, fraudulent conduct, or improper motive" and thus are "excluded" from the § 11 count yields a puzzle, not a "plain statement" of the § 11 claim.  *See* Fed. R. Civ. P. 8(a)(2).  But a directive to provide a more definite statement of the

claim is not necessary, because the Amended Complaint fails plausibly to allege the misstatement or omission element necessary to state a § 11 claim.

**A.   The Amended Complaint Fails to Plead Any Actionable Misstatements or Omissions**

In order to satisfy Rule 9(b) and the pleading requirements of PSLRA as to its § 10(b) claim, the complaint must specify the false or misleading statement about which it complains and must allege the reason or reasons why the statement is false or misleading. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(1)(B)). While a § 11 claim can be based on negligent conduct, the complaint must still allege a false or misleading statement or omission in more than conclusory terms. *In re Morgan Stanley*, 592 F.3d at 360; *accord Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332-33 (2015) (emphasizing that to state a claim for an actionable omission regarding an opinion statement under § 11 of the Securities Act, a complaint "must identify particular (and material) facts going to the basis of the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to the reasonable person reading the statement fairly and in context" (citing *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."))).[26] AmTrust argues that the Amended Complaint fails to allege a misstatement or omission because the allegation that it misclassified losses paid by the

---

[26]     In addition, the false or misleading statement must be material. A statement or omission is "material" if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Starr v. Georgeson S'holder, Inc.,* 412 F.3d 103, 110 (2d Cir. 2005) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988)). "The definition materiality is the same for [section 11 of the Securities Act] as it is under section 10(b) of the Exchange Act." *In re Morgan Stanley*, 592 F.3d at 360.

Luxembourg subsidiaries is "sheer speculation" unsupported by factual allegations.  Def. Mem. at 11, 16-18; Def. Reply at 8.[27]  The Court agrees.

Despite its length, the be all and end all of the allegations of the Amended Complaint is that the loss and loss adjustment expenses, underwriting income, and loss ratio reported in AmTrust's SEC-filed financial reports must be fraudulent because the reported loss and loss adjustment expense cannot be ticked and tied to the aggregate insured losses that AmTrust's subsidiaries reported to insurance regulators in documents prepared in accordance with SAP.  *See* Pl. Mem. at 12 (AmTrust "violated GAAP by failing to include and report in its consolidated financial statement all of its" loss and loss adjustment expenses that were "reported by each subsidiary to insurance regulators").  Lead Plaintiff alleges that "the sum of the premium revenue and losses and loss adjustment expense reported" to insurance regulators and reported in its consolidated financial statements "should match;" because those numbers do not match, AmTrust committed securities fraud.  Am. Compl. ¶ 30; Pl. Mem. at 12.  The Amended Complaint speculates that the reason for the mismatch is that AmTrust improperly eliminated entries for reinsurance agreements with the Luxembourg subsidiaries, resulting in a "misclassification" of ceded losses as "other underwriting expenses" in violation of GAAP.  Am. Compl. ¶¶ 136-43. Lead Plaintiff alleges that AmTrust's reported "miraculous" performance is "too good to be true" and that AmTrust is heading toward financial ruin.  *Id*. ¶¶ 157, 161, 170.

The fact that Lead Plaintiff cannot tick and tie the loss and loss adjustment expense reported in AmTrust's consolidated financial statement to the losses its individual subsidiaries reported to insurance regulators, without more, does not plausibly allege a misstatement.  It is well-settled that

---

[27]     AmTrust argues that it adequately disclosed that transactions between subsidiaries were eliminated when the subsidiaries' financial statements were consolidated, and contends that "the elimination of transactions between consolidated entities does not mean elimination of losses."  Def. Mem. at 7, n.7.  "[T]he losses [went] nowhere.  What [was] eliminated upon consolidation [was] the effect of reinsurance, not the losses themselves."  *Id*.

GAAP provisions are subject to interpretation and "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979).  According to the Amended Complaint, "management has tremendous discretion to determine the current year's loss and loss adjustment expense by estimating the expected future cost of claims."  Am. Compl. ¶ 15.  Given this discretion when calculating loss and loss adjustment expense and given AmTrust's express disclosure that financial statements prepared in accordance with GAAP (as compared to SAP) reflect "different assets and liabilities and different amounts of assets and liabilities," 2012 Annual Report at 29, an observed discrepancy between the two does not plausibly allege that the loss and loss adjustment expenses as disclosed in the financial statements are false.  The Amended Complaint has alleged no *facts* indicating that AmTrust exercised its judgment in a way that violated GAAP beyond its disagreement with management's choices among alternative estimates; but "section 10(b) was not designed to regulate corporate mismanagement." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (citation omitted).  Disagreement with AmTrust's judgment calls is insufficient to allege that AmTrust misstated facts in its consolidated financial statements in violation of § 10(b) of the Exchange Act, or that AmTrust violated § 11 of the Securities Act by incorporating those financial statements into its prospectus and offering statements.  *Accord Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (complaint adequately alleged violations of GAAP and a retroactive announcement of lowered earnings, but the "misrepresentations indicated only mismanagement, not fraud," and "accounting irregularities and overly optimistic disclosures, by themselves, . . . amount to allegations of 'fraud by hindsight,' which [the Second Circuit] has rejected as a basis for a securities fraud complaint" (citations omitted)).

The same is true for the alleged "misclassification" of losses when AmTrust eliminated entries when consolidating its financial statements.  Not only does the Amended Complaint fail to

include factual support for its *ipse dixit* that loss and loss adjustment expenses were "misclassified" as "other underwriting expenses," it provides no support for the notion that the way AmTrust classified its loss and loss adjustment expenses violated GAAP.   *See* Am. Compl. ¶¶ 27, 143, 147.[28]  *Cf. In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006) (plaintiff failed to allege accounting fraud when "notably missing" from the complaint were "specific examples of fraudulent accounting practices utilized by [the defendant], citations to GAAP provisions prohibiting [the defendant's] accounting practices, or reference to any case finding violations of GAAP on the basis of actions similar to those alleged by Plaintiffs").  Oddly, the Amended Complaint does not even address how AmTrust actually accounted for the Equalization Reserves in its consolidated financial statements or allege that said treatment was improper.[29]

In sum, the Court finds that the Lead Plaintiff has not alleged facts that support its conclusory allegation that AmTrust violated GAAP.  In the absence of a restatement or allegations pointing to objective facts that Defendants' accounting methods violated GAAP, carping about

---

[28]    Lead Plaintiff argues that "AmTrust violated GAAP and the federal securities laws when it misclassified [loss and loss adjustment expenses] incurred by its subsidiaries as other unrelated line items on its consolidated income statement," and points to paragraphs 143 to 146 of the Amended Complaint as identifying specific GAAP provisions that were allegedly violated.  Pl. Mem. at 12.  Paragraph 143 of the Amended Complaint conclusorily alleges that AmTrust's use of elimination entries was "a material violation of GAAP," Am. Compl. ¶ 143, even though GAAP provide that "[i]n the preparation of consolidated financial statements, intra-entity balances and transactions shall be eliminated,"  *see id.* ¶ 137 (citing ASC § 810-10-45-1).  Paragraph 144 cites the Statement of Financial Accounting Concepts No. 1, but the Federal Accounting Standards Advisory Board ("FASB") has made clear that "[a] Statement of Financial Accounting Concepts does not establish generally accepted accounting standards."  *See* FASB Concepts Statements, *available at* http://www.fasb.org/jsp/FASB/Page/PreCodSectionPage&cid=1176156317989.  Paragraphs 145 and 146 cite SEC Regulation S-X, 17 C.F.R. § 210.01 *et seq.*, but that regulation sets forth what must be included in financial statements and delegated the authority to promulgate GAAP to FASB; it is not itself GAAP.  In short, the Amended Complaint does not identify any specific provision of GAAP that AmTrust allegedly violated.

[29]    The Corporate Finance Division of the SEC reviewed AmTrust's financial statements for 2012.  Although the SEC had concerns with AmTrust's reporting of deferred tax liability and the disclosures surrounding the tax aspects of the Luxembourg Equalization Reserves, SEC took no issue with AmTrust's reporting of loss and loss adjustment expense and did not require a restatement – even after the GeoInvesting Report purported to "expose" AmTrust's "fraudulent" reporting of its losses.  *See* Def. Mem. at 7-9, 15-16.

Defendants' application of GAAP amounts to no more than a "'naked assertion' devoid of 'further factual enhancement;'" it does not permit the Court to infer that the Defendants committed accounting fraud.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  *Cf. Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 180-81 (S.D.N.Y. 2012) (complaint failed to allege facts that plausibly supported its allegations that the defendant violated GAAP and Federal Accounting Standards; court declined to "intervene in a business and accounting judgment simply because . . . accountants reached different conclusions" about how the defendant should have exercised its judgment), *aff'd sub nom.*, *Century States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013); *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 386 (S.D.N.Y. 2011) (complaint failed to allege a GAAP violation because the complaint cited only generalized "broad provisions" that could not "form the basis for a Section 10(b) violation"), *aff'd,* 776 F.3d 94 (2d Cir. 2015), *and aff'd*, 598 F. App'x 25 (2d Cir. 2015) (summary order); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (complaint failed to allege a GAAP violation "or any inference that [the defendant] was unreasonable in its judgments" when "only the Plaintiffs contend[ed] that [the defendant] had committed these GAAP violations – federal regulators have never claimed any violation" or required a restatement).

Nor does the Amended Complaint plausibly allege false statements by taking aim at AmTrust's actuarial or accounting assumptions (which are, by definition, not statements of fact). *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011) (estimates of goodwill are statements of opinion because they depend on "management's determination of the 'fair value' of the assets acquired and liabilities assumed," which "will vary depending on the particular methodology and assumptions used," and are not "objective factual matters" (citations omitted)). If AmTrust's allegedly outstanding performance was attributable to the "unreasonable"

assumptions to which the Amended Complaint alludes (but fails specifically to identify, *see* Am.

Compl. ¶¶ 21-22, 152-74), the Amended Complaint does not plausibly allege a misstatement of

fact; at best it alleges a difference of opinion regarding the reasonableness of AmTrust's actuarial

or accounting assumptions.[30]

---

[30]    Even if the Amended Complaint had alleged an actionable GAAP violation based on AmTrust's "misclassification" of ceded losses as "other underwriting expenses" or its unreasonable actuarial assumptions, it fails to plead facts that establish a causal connection between the alleged misstatements and the alleged loss. "Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'"  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).  "[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor," that, "when disclosed, negatively affected the value of the security." *Id.* at 173. Alleging that the market reacted negatively to new information about a publicly-traded company, without more, is insufficient to plead loss causation in a private securities fraud action. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (the objective of securities class actions is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause").

    "To plead loss causation, plaintiffs must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'"  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)). "They may do so *either* by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) that 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Id.* at 232-33 (quoting *In re Omnicom Grp., Inc. Sec. Litig*, 597 F.3d 501, 511, 513 (2d Cir. 2010)).

    The Amended Complaint does not allege either type of loss causation with respect to AmTrust's "misclassification" of ceded losses or unreasonable actuarial assumptions.  It alleges that the risks of the unreasonable actuarial assumptions *will* "come home to roost," Am. Compl. ¶¶ 20, 22, but not that they actually *have* come home to roost.  The only actual losses identified in the Amended Complaint occurred between December 12 and 18, 2013, following publication of the GeoInvesting Report, when the share price dropped by $6.63 per share, or 20.2%.  *See id.* ¶¶ 33, 94, 101; *see* Pl. Mem. at 23-25.  There are, however, no facts alleged in the Amended Complaint that tie the Lead Plaintiff's theory of fraud to the share price drop on which it relies to allege loss.  Indeed, the Amended Complaint acknowledges that the GeoInvesting Report was "mistaken" about its "hypothesis" that AmTrust made its "losses 'disappear' by ceding them to its Luxembourg subsidiaries," but adopts its conclusion that AmTrust underreported its loss and loss adjustment expense.  Am. Compl. ¶ 135; *see id.* ¶ 93 (explaining the "relevant assertions" of the GeoInvesting Report).  The Amended Complaint fails to allege any facts to show that the price decline was caused, in whole or in part, by the cherry picked pieces of the report that it contends are true and not the allegations that Lead Plaintiff has cast aside. The GeoInvesting Report is a 17-page dissertation explaining why "short sellers have the winning position in AmTrust Financial Services," Am. Compl. Ex. J at 1; it concludes that "once [its] findings become apparent," AmTrust "will be worth $3.87" per share (at that time, AmTrust was trading at $40.42 per share), *id.* at 16.  *Cf. Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 228 (S.D.N.Y. 2010) (plaintiffs did not adequately allege loss causation based on a 12-page press release about quarterly results that disclosed two accounting errors unrelated to the alleged stock option backdating fraud and failed to explain "why the disclosure on page eight – as opposed to all the other information in the extended 12-page press release – caused the price decline").

    Moreover, the Amended Complaint fails plausibly to allege that the GeoInvesting Report was a *corrective* disclosure.  "A corrective disclosure can be a revelation of a prior statement's falsity or of a material omission, such

Finally, the Amended Complaint alleges that the Defendants "made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made . . . not misleading," Am. Compl. ¶ 214, and that "[t]he prospectus and registration statement for the Preferred Offering contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and/or omitted to state material facts required to be stated therein," *id.* ¶ 234. The factual allegations, however, focus on the same alleged falsity related to AmTrust's loss and loss adjustment expenses. Although the Amended Complaint alleges that Regulation S-X Rule 7-04 requires an insurance company to include a line item reporting "benefits, claims, losses, and settlement expenses" on the face of its financial statements, *id.* ¶ 145, the Amended Complaint does not allege that any of those items were omitted from AmTrust's financial statements, nor does it allege any other information that was omitted

---

that the price of a stock declines as the market absorbs the newly revealed information." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 164 (S.D.N.Y. 2008) (citation omitted). "[A] particular disclosure constitutes a sufficient foundation for loss causation allegations only if it somehow reveals to the market that a defendant's prior statements were not entirely true or accurate." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008) (citation omitted). To be sure, a short seller's report can constitute a corrective disclosure if the report reveals accurate information about a company that exposes actual misstatements by the company. *See, e.g.*, *In re Winstar Commc'ns*, No. 01-CV-3014(GBD), 2006 WL 473885, at *12-15 (S.D.N.Y. Feb. 27, 2006) (plaintiffs adequately alleged loss causation based on a report by a short seller that the company had insufficient cash flow to fund its operations and would likely default on its credit obligations; the company filed for bankruptcy six weeks later).

Here, however, time has shown that the GeoInvesting Report did not "correct" public knowledge about the company. AmTrust has not restated its financial statements. AmTrust did alter how it recorded its Equalization Reserves at the SEC's suggestion, but that change had no impact on its loss and loss adjustment expense. *See* Tully Decl. Ex. 1 ("AmTrust 2013 Report") at 75 (explaining reclassifications). Rather than injecting new information into the market that was absorbed into a corrected stock price, the GeoInvesting Report caused a temporary price drop (which presumably resulted in a pecuniary gain for its author). *Cf. In re Winstar Commc'ns*, 2006 WL 473885, at *14 (observing that the Supreme Court's "paramount concern" in *Dura* was "the inherent veracity of the information," and that "the exposure of the falsity of the fraudulent representation" is "the critical component of loss causation"); *id.* at *15 ("Allegations that the market reacted negatively to an opinion or speculation which in fact exposes the falsity of defendants' representations can be sufficient to plead loss causation.").

In sum, the Amended Complaint does not plead sufficient facts to show that the alleged misstatements actually caused the plaintiffs any losses. *Cf. Lentell*, 396 F.3d at 175 (affirming dismissal of a securities class action because the complaint did not allege "that the market reacted negatively to a corrective disclosure regarding the falsity of" the subject of the defendant's statements (buy/accumulate recommendations regarding a stock that went under) and contained no allegation that the defendant "misstated or omitted [investment] risks that did lead to the loss").

that would have been necessary to prevent AmTrust's existing disclosures from being misleading. The federal pleading standard of Rule 8(a) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," mere "labels and conclusions," and "a formulaic recitation[s] of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555); *accord Dura Pharm., Inc.*, 544 U.S. at 346-47. In short, the Amended Complaint fails to allege a false statement, or an omission of fact necessary to make the statements AmTrust did make not misleading, under the heightened standard of § 10(b) of the Exchange Act or the short and plain statement standard of § 11 of the Securities Act.

**B.      The Complaint Fails Adequately To Allege Scienter**

Even if the Amended Complaint had adequately alleged a misstatement or omission, the claims pursuant to § 10(b) of the Exchange Act would nonetheless fail because the Amended Complaint does not adequately allege scienter. To plead scienter, a plaintiff must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The "required state of mind" is an "intent to deceive, manipulate, or defraud," or recklessness. *Blanford*, 794 F.3d at 305 (citations omitted). The Court must "take into account plausible opposing inferences" and consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). The inference "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.*, 493 F.3d at 99.

In the context of private securities fraud actions, recklessness means "conscious recklessness – *i.e.*, a state of mind approximating actual intent." *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (emphasis omitted)).  Examples of recklessness are "highly unreasonable" conduct that "represents an extreme departure from the standards of ordinary care," failing to review or check information they had a duty to monitor, or ignoring obvious signs of fraud.  *Id.*  It is "not merely a heightened form of negligence."  *Id.*  "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'"  *Blanford*, 794 F.3d at 306 (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009)).

Lead Plaintiff argues that the circumstantial evidence alleged adequately establishes scienter, including (1) the failure to cross check AmTrust's loss and loss adjustment expenses reported in its Annual Reports with reports to insurance regulators by its subsidiaries, Pl. Mem. at 19; (2) imputed knowledge of the disparity between the sum of losses calculated under SAP and under GAAP for purposes of calculating the loss ratio and loss and loss adjustment expense to the Individual Defendants as "key officers" of AmTrust under the "core operations inference," *id.* at 19-20; (3) the "obviousness" of the "falsity of AmTrust's consolidated [loss and loss adjustment expense]" because uncovering the disparity "only required summing the [loss and loss adjustment expense] of its subsidiaries," *id.* at 20; (4) an inference of the Individual Defendants' familiarity with the "key metrics" because they discussed the reports on investor conference calls, *id.* at 21; (5) AmTrust's correction of an error regarding how it recorded ceding commissions to third-party

reinsurers, *id.* at 21; (6) AmTrust's correction of an error to report the Equalization Reserves as a deferred tax liability rather than a statutory liability, *id.* at 21-22; and (7) a motive to conceal its actual losses "in order to obtain more than $600 million from a series of debt and equity offerings during the Class Period at lower costs," *id.* at 22.   None of these allegations, individually or collectively, comes close to supporting a strong inference of scienter under established Supreme Court and Second Circuit precedent.

In order adequately to plead scienter on the basis that defendants "knew facts or had access to information suggesting that their public statements were not accurate," plaintiffs "must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 308, 311.  "[B]road reference to raw data [that] lacks even an allegation that these data had been collected into reports that demonstrated" the inaccuracy of public statements does not give rise to an inference of scienter. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).  The Amended Complaint's broad allegations that Defendants "knew" that the aggregate loss and loss adjustment expenses reported to insurance regulators by AmTrust's subsidiaries differed from the loss and loss adjustment expense reported in AmTrust's consolidated financial statements, either because of their review of regular financial reports or their statements on investor calls, lacks the specificity required to plead a securities fraud claim – the Amended Complaint does not allege that the raw data had been collected into reports that demonstrated the difference or that, even if it had, the explanation that SAP reporting is different from GAAP reporting would not have adequately explained the discrepancy.  Similarly, the Amended Complaint failed to plead an inference of scienter based on defendants' "fail[ure] to review or check information that they had a duty to monitor" because it failed to "specifically identif[y] . . . reports or statements that would have come to light in a reasonable investigation [or]

that would have demonstrated the falsity of the allegedly misleading statements." *Id.* The Amended Complaint identifies no such reports.

Although the Amended Complaint alleges that AmTrust has a "pattern of misclassifying items on its income statement" because AmTrust "reclassified" how it reported commissions for policies ceded to third-party reinsurers, Am. Compl. ¶ 34, a review of AmTrust's annual reports and correspondence with the SEC does not reveal a "pattern" of reclassifications or even that AmTrust did a "restatement."  Instead, it reveals that AmTrust reclassified how it recorded ceding commissions[31] from recording them as revenues to recording them as a reduction of acquisition costs and other underwriting expenses.  Dec. 4 Letter at 10.  Although the "reclassification" was a "correction of error," it was not "material" and did not require a restatement.  *See* Letter of Ronald E. Pipoly, Jr., AmTrust Financial Services, Inc., to Jim B. Rosenberg, U.S. Securities and Exchange Commission (June 20, 2014) (via EDGAR) ("June 20 Letter") at 3.  Although ignored in the Amended Complaint, in its letters to the SEC's Division of Corporate Finance, AmTrust elucidated how it recorded its Equalization Reserves and formulated additional disclosures and revisions to improve its disclosure in future financial reports.  *See* Jan. 16 Letter at 4-10.  The fact that AmTrust clarified and improved its disclosures around its practice of ceding commissions and the use of Equalization Reserves does not raise an inference of an intent to deceive shareholders. To the extent it raises any inference, the most compelling inference is of a nonfraudulent intent – the desire to satisfy the SEC regarding a difference of opinion about the appropriate level of disclosure regarding the impact of reinsurance by Luxembourg subsidiaries.  Financial statements are complicated documents and reasonable minds can differ on the appropriate level of disclosure; acceding to suggestions from the SEC and correcting errors simply does not suggest that the initial

---

[31]     Ceding commissions provide for reimbursement of the insurer for acquisition related costs and other operating costs associated with the ceded premium.  *See* Dec. 4 Letter at 10.

disclosures were made with fraudulent intent.  The opposite conclusion – that every dialogue with the SEC that results in improved financial disclosures but no restatement gives rise to a plausible inference of fraud – would do little to further the "important securities law objective" of "deterring fraud . . . through the availability of private securities fraud actions," but much to increase the settlement value of meritless lawsuits.  *Dura Pharm., Inc.*, 544 U.S. at 345, 347-48 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975)).

Finally, the Second Circuit has "consistent rejected as insufficient in securities fraud pleading" allegations that a defendant has fraudulent intent "based on motives possessed by virtually all corporate insiders," *Teamsters Local 445*, 531 F.3d at 196-97, including "the desire to maintain a high corporate credit rating . . . or otherwise sustain the corporate appearance of corporate profitability," and "the desire to maintain a high stock price in order to increase executive compensation, . . . or prolong the benefits of holding corporate office," *Novak*, 216 F.3d at 308 (internal citations omitted).  Thus, the Amended Complaint's allegations that Defendants were motivated to commit securities fraud because they wanted to maintain the appearance of profitability and access to capital does not suffice to allege scienter.

## C.     The Amended Complaint Fails to State a § 20(a) Claim

"Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law."  *Pac. Inv. Mgmt. Co. LLC*, 603 F.3d at 161 (citing 15 U.S.C. § 78t(a)).  Because Lead Plaintiff has failed to state a claim for a primary violation against AmTrust, it cannot establish control person liability.  Accordingly, the claims against the Individual Defendants are also DISMISSED.  *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

## III.  CONCLUSION

The Amended Complaint fails adequately to allege actionable misstatements or omissions necessary to state claims pursuant to §§ 10(b) and 20(a) of the Exchange Act and § 11 of the

Securities Act and fails adequately to allege scienter necessary to state claims pursuant to §§ 10(b) and 20(a).  Accordingly, Defendants' motion to dismiss is GRANTED.  The Clerk of Court is requested to terminate No. 14-cv-736 and all pending motions therein, and the consolidated action, No. 14-cv-945.


**SO ORDERED.**

Date:  **September 29, 2015**
      **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**